Mary Lee **GEESBREGHT**, Appellant,

v.

John **GEESBREGHT**, Appellee.

No. 17985.

Court of Civil Appeals of Texas, Fort Worth.

July 13, 1978.

Rehearing Denied Sept. 14, 1978.

Brown, Crowley, Simon & Peebles and Anne Gardner, Fort Worth, for appellant.

Hooper, Chappell & Broiles and R. David Broiles, Fort Worth, for appellee.

## OPINION

MASSEY, Chief Justice.

In this divorce case we affirm those portions of the trial judgment which granted a divorce and awarded custody of the parties' minor children to the father; and at the same time reverse and remand for another trial that portion of the trial court's judgment decreeing division of the property involved.

The trial court's judgment was rendered upon both the petition for divorce filed by John Geesbreght against his wife Mary Lee and upon the cross-petition for divorce by Mary Lee. Each will be hereinafter re-

ferred to by their first names. Declaration for relief by each party was upon the generally termed "no fault" ground of Tex. Family Code Ann. § 3.01, (Supp.1978) "Insupportability" of Chapter 3, "Dissolution of Marriage".

## ON THE JURISDICTION

▇▇▇ Mary Lee desired that that part of the judgment which decrees the parties' divorce be affirmed on appeal. Nevertheless, she has a point of error founded upon the trial court's decision that it had jurisdiction of the case. Mary Lee left her husband's domicile in Fort Worth, Texas, on January 20, 1976; on January 22, 1976, she filed a suit against him in the Circuit Court of Cook County, Illinois for separate maintenance and for custody of the parties' children. A suit for separate maintenance is not valid by Texas law. On February 10, 1976 John filed his suit for divorce in the Tarrant County court from which there is this appeal. Both suits pended until August 17, 1976 when the Illinois court dismissed that of Mary Lee for want of prosecution. There was reinstatement of such case on September 14, 1976 upon the petition of Mary Lee. The Tarrant County suit continued to pend. Before the Illinois case was reinstated and on August 30, 1976 Mary Lee appeared before the Tarrant County court at a hearing in connection with her plea to be temporarily appointed managing conservator of her children. The circumstance presents a situation where Mary Lee has waived her right to complain of jurisdiction. The jurisdiction of the Tarrant County court was secure as of the time of dismissal of Mary Lee's suit in Illinois even though a question might have persisted (had she filed a plea to the jurisdiction— and none was filed either in compliance or non-compliance with the "due order of pleading" rules) had the dismissal not occurred and/or had there been no waiver during the period during which the Illinois case was a dismissed case. At no time was the Tarrant County court ever requested to take judicial notice of Illinois law, and such law was not proved.

▇▇▇ What we have said in the preceding paragraph does not necessarily cover Mary Lee's contention that the Tarrant County court did not have the requisite jurisdiction which authorized it to make an enforceable decree concerning custody of the children. By the circumstances we consider the question moot. Mary Lee appealed the judgment of the Tarrant County trial court to this appellate court while withholding custody of her children from John, contrary to the provisions of the trial court judgment. John presented such facts to this court and moved for dismissal of Mary Lee's appeal. The proper order of an appellate court is to dismiss the appeal where an appellant is in obvious contempt of the judgment of the trial court from which the appeal has been taken. See *Strange v. Strange*, 464 S.W.2d 216 (Tex. Civ.App.—Fort Worth 1970). See also the opinion of the supreme court answering certified questions upon other aspects of the same case at 464 S.W.2d 364 (Tex.1971). The day before John's motion to dismiss the appeal was scheduled to be heard Mary Lee caused or permitted the children to be delivered to John in Tarrant County, Texas, making proof to this court that such had been done. The motion to dismiss the appeal was withdrawn. We have continued to honor Mary Lee's appeal.

Apart from the foregoing we nevertheless have considered the question of jurisdiction of the trial court, as of the time it rendered judgment and as of the time its jurisdiction passed (for necessary purposes) to this appellate court. We hold that the court below had jurisdiction of the children and authority to make the adjudication upon their custody.

Though the adjudication is as upon a case *in rem* in that it was upon the status of the children (so that there is the legal requisite that the trial court have jurisdiction not only of the husband and wife but also of their children for purposes of an enforceable custody decree) we hold that by the circumstances the domicile of the children was in Texas. Of course the trial court had jurisdiction for purposes of divorce.

The facts were not in dispute. Mary Lee took the children from Fort Worth on January 20, 1976 and removed them to Illinois.

John did not know, if it was the fact, that Mary Lee did not intend to return to Texas or did not intend to return the children to Texas. He did not consent to any change of the domicile of the children. He did not refuse to continue support. John provided support for the family at all times. Mary Lee·did not work outside the home. Regardless of her unhappiness in her marital relationship there existed no danger or threat to her security or to that of the children which occasioned a change of domicile. Mary Lee did not return the children to Texas until after jurisdiction existed in this court by reason of her appeal. The children were not in Texas at time of the divorce and custody decree nor at time Mary Lee's appeal was perfected.

Of course we are considering "domicile by operation of law", i. e., analagous to what was formerly that of a wife arising upon her marriage. Of little value are the cases prior to the adoption of Texas' Constitutional Equal Rights Amendment: Tex. Const. art. 1, § 3a, "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative". The Amendment was adopted November 7, 1972. See Vol. 5, No. 2, Symposium, 1974, Tex.Tech.L.Rev., Sampson, "The Texas Equal Rights Amendment and the Family Code: Litigation Ahead". To be kept in mind, however, are the old cases bearing upon the question. See 4 A.L.R.2d p. 7 Annotation: "Jurisdiction to award custody of child having legal domicile in another state", and 9 A.L.R.2d p. 434, "Jurisdiction of court to award custody of child domiciled in state but physically outside it."

We hold that Texas has effectively legislated, in the Texas Family Code, by its § 12.04, "Rights, Privileges, Duties, and Powers of Parent" where there is provision that, except as provided by judicial order or by an affidavit of relinquishment of parental rights executed under § 15.03, the parent of a child has, among other rights, privileges, duties, and powers, "the right to have physical possession of a child and to establish its legal domicile". (The provisions of § 15.03, "Affidavit of Relinquishment of Parental Rights" are inapplicable to this case.) Prior to the separation of Mary Lee from John they had jointly established Tarrant County, Texas, as their legal domicile and also that of their children.

Tex. Family Code Ann. § 3.26 (Supp.1978) "Acquiring Jurisdiction over Nonresident Respondent" provides that when the petitioner in a suit for divorce is a resident or a domiciliary of this state at the time the suit is filed personal jurisdiction by the court shall exist over the respondent, although the respondent is not a resident or domiciliary of Texas, if this is the last state in which marital cohabitation between petitioner and respondent occurred and the suit is commenced within two years after the date on which cohabitation ended,—and that a court acquiring jurisdiction under the section also acquires jurisdiction in a suit affecting the parent-child relation if § 11.051 of the Code is applicable.

Tex. Family Code Ann. § 11.051 (Supp. 1978) "Acquiring Jurisdiction Over Nonresident", provides that in a suit affecting the parent-child relationship, the court may exercise personal jurisdiction over a person on whom service of citation is required, though a non-resident or domiciliary of this state, if the person on whom service is required has resided with the child in this state, and even where the section might otherwise be deemed inapplicable, if there is any basis consistent with the constitutions of this state or the United States for the exercise of the personal jurisdiction. Note the Law Review Commentaries listed under this section. § 11.051 is applicable in the situation posed by the case at bar.

On the "long-arm jurisdiction" of Tex. Family Code Ann. § 3.26 (Supp.1978) it has been held that a Texas court properly exercised its jurisdiction over a non-resident defendant where suit was filed within two years after the termination of a 2½-month period of cohabitation of the parties in Texas. *Scott v. Scott*, 554 S.W.2d 274 (Tex.Civ.

App.—Houston [1st Dist.] 1977, no writ hist.). The case involved custody of a child as well as divorce.

## ON THE JURY TRIAL UPON CUSTODY

■ The matter of custody of the parties' minor children was tried to a jury before the Honorable Gordon Gray, District Judge. Without objection two special issues were submitted along with a definition of the term Managing Conservator which in general "tracked" the language of Tex. Family Code Ann. § 14.02 (Supp.1978) "Rights, Privileges, Duties, and Powers of Possessory Conservator", save that there was not included in the definition the provision that the managing conservator has "the right to have physical possession of the child and to establish its legal domicile". There was not an objection to the definition.

By ultimately returned answers to the two issues submitted the jury found for John to be awarded care and custody of the child (1) Andrea Marie Geesbreght would be to best serve her welfare and best interests; and (2) for him to be awarded care and custody of the child John Alexander Geesbreght would be to best serve that child's welfare and best interests. Time when the special issues were answered came after additional issues were submitted, to be subsequently explained.

In connection with the above the jury was told, as a part of the instructions given, that "CHOICE Without Regard to Sex of Parent: You are instructed that the rights of the father and mother are equal with respect to the custody of their child, but that the welfare and best interests of the child is of controlling importance, and it will be your duty to find according as you may believe from a preponderance of all the evidence as to what would be for the welfare and best interest of the child, and you will answer this issue as you may find the facts to be."

The state of the evidence was such that the jury knew that if there were findings that John Geesbreght should be awarded the care and custody of the children (or that such would serve their best interests) he would become the managing conservator. There was additional clarification in the arguments made to the jury. Not made clear to the jury was any right of a "possessory conservator". What was clearly shown to the jury by the evidence was that if the father was granted custody of the children (made managing conservator) that, if the mother would move to Texas, he was willing that she should have "unlimited visitation rights".

At 10:05 o'clock A.M., after the case was argued, the jury received the case and began deliberations. At 2:50 o'clock P.M. the jury sent out word that it would like to see the judge. The judge sent back his note that the jury should put any requests in writing. About 5:00 o'clock P.M. a written notice was sent to the judge stating that the jury was deadlocked. The jury was brought into the courtroom. Upon inquiry of the judge, the foreman advised that the jury stood nine to three. The jury was directed to return to the jury room for further deliberations. At this point in time the foreman asked whether the jurors were compelled to reach a verdict. The judge answered "I wouldn't say that you are compelled. What I said in the charge is true. If you don't reach a verdict, the same jury will have the same problem and they won't find it any easier than this jury. You are making progress if it's nine to three. All right, you may retire to the jury room." No objection was made by either party. After about 20 minutes the jury was excused to return the following court-day.

On the next day for proceedings in the business of the court deliberations were begun by the jury at 9:00 A.M. Soon after the jury sent out Note A–3 inquiring "Is conservatorship up for review periodically?", and thereafter Note A–4 inquiring "What would be legal assurance that Mary Lee can, in fact, have unlimited visitation rights if John is awarded managing conservator". In answer the court asked the jury to review the Charge as previously submitted. About 2:00 o'clock P.M. the jury sent in a note informing the judge that it was deadlocked. At about 2:30 P.M. the

jury sent the judge a note which read: "As stated by law, define 'Unlimited Visitation'".

At this point the court prepared a supplemental charge, reading:

The definition of Possessory Conservator is as follows:

A Possessory conservator has the following rights, privileges, duties, and powers during the period of possession, subject to any limitations expressed in the decree:

(1) the duty of care, control, protection, and reasonable discipline of the child;

(2) the duty to provide the child with clothing, food, and shelter;

(3) the power to consent to medical and surgical treatment during an emergency involving an immediate danger to the health and safety of the child; and

(4) any other right, privilege, duty or power of a managing conservator expressly granted in the decree awarding possession of the child.

### SPECIAL ISSUE NO. 3.

What rights, privileges, duties, and powers do you find that the possessory conservator should have?

ANSWER: (Ultimately answered by the jury as: "Items 1, 2, 3, 4 as stated under definition of possessory conservator of page one of this document. In addition, the option to review as necessary to insure that the Possessory Conservator's right to unlimited visitation is, in fact, adhered to.")

### SPECIAL ISSUE NO. 4.

What should be the visitation rights of the possessory conservator?

ANSWER: (Ultimately answered by the jury as: "Unlimited".)

Before calling the jury from the jury room into the court room the judge asked if there were any objections to the court's submission of the supplemental charge. Mr. Meyer, attorney for Mary Lee, replied "Yes, Your Honor, we object to it on the grounds that it constitutes a submission of an issue which has not been tried to the jury by the evidence. And, on the contrary, the Court instructed the jury at the beginning of the trial and during the submission of the instructions to the jury that the Court would decide all matters other than Managing Conservatorship including the rights, duties and responsibilities of the Possessory Conservator."

The objection was overruled. The jury was brought back into court and, with other oral statements made to the jury by the court to which there was no objection, was told the supplemental charge would be submitted and it was submitted. There was no argument thereupon and there was no request therefor. The jury took the supplemental along with the original charge into the jury room. Rather promptly thereafter the jury returned its verdict as embraced by its answers to all special issues of both the original and supplemental charges.

No reversible error appears. The questions asked in the supplemental charge were in neither case such as required a finding upon an ultimate issue. The answers could amount to no more than recommendations, at least other than that as the possessory conservator Mary Lee should have all the rights of that office. This she did receive by the judgment. As already noticed, the jury was not misled in any failure to understand that the managing conservator should have the paramount custodial rights in and to the children, with visitation rights of any other and with rights of any possessory conservator subject thereto. It does appear that the failure of the original charge to show the jury what rights by law were vested in one who was a possessory conservator and, perhaps, an inability to express its desire to state an opinion that Mary Lee should have the most extensive of visitation rights upon the face of the instrument, caused difficulty in arriving at an agreement to make the finding that John should have the paramount rights of managing conservator. We see no error on trial which amounted to reversible error by Tex.R.Civ.P. 434, the Texas "harmless error" rule.

Submission of the immaterial Special Issue No. 3 was not subject to the only complaint made in the objection, which was that it presented new issues of fact which had not been tried. That being the only complaint, any additional complaints which might have been made were waived. By provision of Tex.R.Civ.P. 286, "Jury May Receive Further Instructions" there is authority for instructions to the jury, even after it has retired and begun deliberations. Even a new and different controlling issue in the case may be submitted under Tex.R.Civ.P. 286, though there would be reversible error if there was denial of the right to make additional jury argument upon an issue thus submitted in a supplemental charge. In the denial of such it has been held there would be probable harm, though not merely because there was a supplemental charge given by the court. *Boler v. Coughran*, 304 S.W.2d 290 (Tex.Civ.App.— San Antonio 1957, writ ref'd).

The answers to Special Issues Nos. 1 and 2 were not so contrary to the greater weight and preponderance of the whole of the evidence in the case as to be clearly erroneous. There was not reversible error by trial before the jury of the issues submitted.

### SEVERABILITY OF JUDGMENT ON CHILD CUSTODY AND DIVORCE FROM JUDGMENT RELATIVE TO PROPERTY PARTITION.

7 St. Mary's L.J. 1 (1975), "Try, Try, Again . . .", "A Proposal to Limit the Scope of New Trials in Texas" by Justice Jack Pope with Daniel J. Sheehan, Jr., contained recommendations which were adopted and made effective January 1, 1978, in Tex.R.Civ.P. 320, "(New Trials) Motion and Action of Court Thereon". The Rule so adopted, and also—since January 1, 1976— provisions of Tex.R.Civ.P. 434, "If Judgment Reversed" authorizes new trial of the part of the controversy which is clearly separable without unfairness to the parties. We can now affirm the trial court's judgment insofar as it grants the decree of divorce, and as it decrees the custodial rights to the parties' children, though we might find ourselves obligated to remand for another trial the issues upon the division of property upon the grant of divorce. *Young v. Hicks*, 559 S.W.2d 343 (Tex.1977).

In the instant case, we have concluded that there should be a new trial on the issues appropriate to the determination of correct property division.

### PARTITION OF PROPERTY UPON DIVORCE.

By agreement issues on property were tried by the court without a jury.

The date of the trial court's judgment was August 30, 1977. In the event of retrial, issues relative to the property of the parties, as existent upon that date, would be those to be retried. This is so because we have affirmed the part of the judgment which decrees divorce, meaning that from August 30, 1977 each party was divorced from the other though no proper division of their property was made at the time.

The occasion for what is considered to require remand of the case relative to property division lies in the court's having treated the stock held by John Geesbreght in a Professional Corporation not to have been enhanced above its book value by any "good will" of the corporation developed during the period when he owned it. John not only held the stock but worked as an employee. In the approximate eighteen months of John's interest there had been an improvement of corporate business to the extent that it had become unusually profitable.

John is a physician. Had his practice been that of an individual, then, in the event of divorce, the "good will" existent and which might have a value upon a sale of his practice or interest therein to another member of the same profession (with whom he might agree not to compete) would not be properly considered as part of the property to be taken into consideration in the property division to be made as part of the parties' estate because there was a divorce. *Nail v. Nail*, 486 S.W.2d 761 (Tex.1972).

The case appears in 52 A.L.R.3d p. 1338, followed, at p. 1344 by ANNOTATION: "Accountability for Good Will of Professional Practice in Actions Arising from Divorce or Separation". In that case there was the implied holding that the trial court had erroneously considered as evidence that which was "no evidence" or "not legal evidence" because it was improperly considered. Of course, what resulted by the trial court, which was reversed, was an amount of judgment contrary to the greater weight and preponderance of the evidence. Posed was actually a "no evidence" question for the supreme court would not otherwise have had jurisdiction.

In *Nail, supra* at p. 764, the court took occasion to state: "It is to be understood that in resolving the question at hand we are not concerned with good will as an asset incident to the sale of a professional practice, or that may exist in a professional partnership or corporation apart from the person of an individual member . . . ."

Here we have that very question with which the supreme court stated itself not to be concerned, i. e., good will in Emergency Medicine upon which there was the necessity to find what portion, if any, apart from John's person as an individual employee member, existed in that the corporation occasioning enhancement in the value of its corporate stock. We hold that there was "value" of such good will and that the trial court erred in the failure to take it into consideration in rendering the judgment from which the appeal was taken.

From the record we understand that in the field of medicine there has apparently arisen at many hospitals a need for the services of physicians at unusual hours in rendering emergency services, primarily at the emergency rooms. In ordinary medical practice the average doctor naturally prefers normal hours and the opportunity to know when he will probably be able to be with family or friends. Such a doctor, and no doubt there are many, is pleased to be relieved of the emergency duties performed at hospitals.

Some time ago, apparently in Dallas, Texas, a Dr. Lambert conceived the idea of making such emergency room services by physicians a specialized form of endeavor. Subsequently a Dr. Riggs became associated, and as applied to this particular work they called their organization the Emergency Health Services Associates, apparently a professional corporation. Dr. Riggs bought Dr. Lambert's 50% ownership (of stock if it was a corporation) and himself became what we will call the Emergency Health Services. This has remained an entity, probably still doing business.

In August of 1974 John Geesbreght made a contract of employment with Emergency Health Services (Dr. Riggs) and for it performed the work of a physician in emergency room service at a Fort Worth hospital which will for convenience be called Harris. By subsequent arrangement, concluded in the spring of 1974, John became a partner of Dr. Riggs. When this partnership was formed Emergency Health Services ceased to supply the emergency services at Harris in Fort Worth. The partnership of Dr. Riggs and John, which they chose to call Emergency Medicine Consultants, took from Emergency Health Services the contract it had with Harris. Emergency Medicine Consultants began handling the Harris' account as its own. This continued until November of 1975 when the partnership ceased as such, with the organization of the corporation Emergency Medicine Consultants, a Professional Corporation under the provisions of V.A.T.S. Title 32, "Corporation", Art. 1528e, et seq. "Professional Corporation Act". Dr. Riggs paid in $500.00 and John paid in $500.00, each receiving 500 shares of stock. They were the only stockholders. The business was that of supplying emergency room services of physicians at hospitals, but upon an expanded scale. The corporate business so begun proved successful; by time the divorce suit of John and Mary Lee Geesbreght was tried in July 1977 it was supplying hospital emergency room service by physicians in its employ at eight (8) different locations. There had been three (3) additional hospitals where the services had begun but at which they

had been terminated to time of trial. One year's gross receipts of Emergency Medicine Consultants for these services amounted to more than $1,000,000.00. The corporation will hereafter be referred to as Emergency Medicine.

At a time prior to the divorce trial Emergency Medicine (50% Dr. Riggs) had had occasion to pay Emergency Health Services Associates (100% by Dr. Riggs) the sum of $36,000.00 for contract negotiations by the latter in behalf of Emergency Medicine. As a result, Emergency Medicine acquired four (4) of the aforementioned eleven (11) hospital contracts. The Harris hospital contract was transferred to Emergency Medicine by agreement and without any payment and Harris' contract evidently became that of Emergency Medicine. There John had begun to personally perform the emergency room hospital services in 1974, continued by him during the partnership period beginning in the spring of 1975, and still continuing when Emergency Medicine was incorporated in November of 1975. Little, if any, of the hospital emergency room services at locations other than Harris was ever personally performed by John, but all, or nearly all, the services at Harris were performed by him. The Harris contract with Emergency Medicine provides for cancellation at any time. Here would be the contract where any "good will" built up by and through satisfaction with John's services would be, percentagewise, more personal to him and, to the extent it might be found personal, not proper to be taken into consideration in the division of property upon divorce.

However, over the entire field of operations by Emergency Medicine there are about ten full-time, and 50 to 100 part-time physicians with whom Emergency Medicine has employment contracts to fulfill its obligations to furnish emergency services at the hospitals with which it has contracted. By the evidence each of these physicians receives 80% of what is received by the hospital from third persons for services he has rendered at the hospital, of the 100% which is received by Emergency Medicine. (Emergency Medicine is paid the 100% and Emergency Medicine pays 80% to each physician entitled thereto.)

There may be minor discrepancies in what we have stated and will state relative to the business operations, though if that be true it would make no difference in our ultimate conclusions and holdings.

Of the 20% resultant gross profit of Emergency Medicine after each employed physician is paid John receives 5% for his services as "director" as applied to payment for the corporate services at Harris, and/or as "regional director" of the services rendered at other locations. Emergency Medicine receives 5% as earnings in the form of "contract fee". The remaining percentage to explain is thus made 10%. Of this 10% in receipts the majority is applied to pay for necessary services as by a secretary, bookkeeper, etc.; with something between 2% and 4% going into Emergency Medicine's treasury as profit. This "profit", whatever the monetary amount, would become the ultimate entitlement of the two stockholders—on a 50–50 basis, because 50% of the shares belonged to Dr. Riggs and 50% to John. We need not at this point concern ourselves with the earnings represented by the term "contract fee".

"Good will" is sometimes difficult to define. In a personal service enterprise such as that of a professional person or firm, there is a difference in what it means as applied to "John Doe" and as applied to "The Doe Corporation" or "The Doe Company". If "John Doe" builds up a reputation for service it is personal to him. If "The Doe Company" builds up a reputation for service there may be a change in personnel performing the service upon a sale of its business but the sale of such business naturally involves the right to continue in business as "The Doe Company". The "good will" built up by the company would continue for a time and would last while the new management, performing the same personal services, would at least have the opportunity to justify confidence in such management while it attempted to retain the "good will" of customer clients of the former operators.

At least the opportunity to have time to try to preserve the "good will" already existent and to use it as an entrance into the identical field of operations in a personal service type of business would be present where the name of the business is a company name as distinguished from the name of an individual. Therein does it have value, plus the value of the opportunity to justify confidence in the new management by the customer/clients of the predecessor owner(s).

It is as applied to the foregoing that we consider Emergency Medicine to possess what we treat as "good will" as part of its worth and value under the circumstances of this case, and therefore an asset which would have value to some extent apart from John's person as a professional practitioner.

· It is clear that in the event John sold his stock to another physician then—save perhaps at Harris Hospital—there would be an opportunity to retain the contracts of Emergency Medicine if the services of its employed physicians in the various emergency rooms continued to be satisfactory.

On this it was shown that the Emergency Medicine contracts generally had either a 30 or 60 day cancellation provision "without cause", and a 24 hour cancellation provision "with cause". Also shown was that Dr. Riggs had a contract with John relative to sale or transfer of John's stock. In the event of John's death, Dr. Riggs is by this contract entitled to all of John's stock at the price of $50,000.00, and in the event John desires to sell his stock before that time, Dr. Riggs has the privilege of purchasing it at a price of $50,000.00.

We think it obvious that to take the figure of $16,000.00, which was proved to have been the "book value" of John's 500 shares of stock in Emergency Medicine Consultants, and use it as the "actual value" of the stock as its worth to be taken into consideration by the court in the division of the estate upon divorce was, under the circumstances of the case, reversible error. We hold that it resulted in gross inadequacy in the award on property division as applied to Mary Lee; that it also resulted in an award to her which was so contrary to the greater weight and preponderance of the whole of the evidence on trial as to be clearly erroneous. Further, we hold that the court erred in considering as "no evidence" that which was evidence in that under the circumstances of the case. The value of the stock in Emergency Medicine Consultants was enhanced by some "good will" which was existent as applied to that professional corporation apart from the person of John Geesbreght.

■ It is error for a court not to take into consideration all relevant property interests in reaching equitable division of the property on divorce. *Gillis v. Gillis*, 435 S.W.2d 171 (Tex.Civ.App.—Fort Worth, 1968, writ dism'd); *Matter of Marriage of Butler*, 543 S.W.2d 147 (Tex.Civ.App.—Texarkana, 1976, writ dism'd); *Matter of Marriage of Long*, 542 S.W.2d 712 (Tex.Civ.App. —Texarkana, 1976, no writ hist.).

In this case, for reasons stated, we hold that the trial court erred in failure to take into consideration all relevant property interests.

We have discussed the important matters necessary to disposition of the appeal. We have considered all points of error presented and they are overruled except for those whereby our action, below stated, has been determined.

Judgment is affirmed insofar as it granted the divorce and determined the custodial rights of the parties' children. Judgment is reversed and remanded for another trial on the matter of the appropriate property division.

Cost of the appeal are taxed 50% to John Geesbreght and 50% to Mary Lee Geesbreght.