

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00332-CV

JESSICA JACKSON HILL                                                    APPELLANT

V.

STEVEN HILL                                                            APPELLEE

----------

## FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In two issues, Appellant Jessica Jackson Hill appeals the property division in the trial court's divorce decree, arguing that the trial court applied the wrong standard to value Appellee Steven Hill's partnership interest in KPMG, LLP (KPMG) by failing to account for commercial goodwill and for a guaranteed

---

[1]*See* Tex. R. App. P. 47.4.

income component included in the partnership agreement, leading to an unfair and unjust property division.

Steven concedes that while KPMG may have commercial goodwill, the community estate is not entitled to share in it because he has no equity or ownership interest in KPMG and his ability to share in its profits is limited and governed by the partnership agreement, which also defines "guaranteed compensation" and sets out a computation that equates to his earned income. We affirm.

## II. Factual and Procedural Background

Steven became a Class B principal in KPMG, a public accounting firm with approximately 1,900 partners and principals in the U.S. division, shortly after he married Jessica. At the final divorce hearing, Steven, Jessica, and their experts testified about Steven's interest in KPMG, and in the divorce decree, the trial court awarded to Steven "[a]ll interest he may own in the partnership known as KPMG, LLP., including his capital account with KPMG, LLP." It also allocated to Steven "[t]he loan against his KPMG, LLP[.], Partnership capital account." The nature of Steven's interest in KPMG determines the outcome of this appeal.[2]

---

[2]At oral argument, Jessica characterized Steven's interest in KPMG as an interest in an ongoing Delaware limited partnership, while Steven described it as an interest in a "faux" partnership in which Steven paid for the nontransferable right to a percentage of the firm's capital account.

## A. 2008 Partnership Agreement

The trial court admitted the 2008 Partnership Agreement (the Agreement) into evidence. The Agreement sets out that "members" are its partners and principals and distinguishes between "partners," which it defines as "other than Principals," and "principals," which it defines as parties "who are not Certified Public Accountants." The Agreement also indicates that notwithstanding the different nomenclature, each principal's relationship to the firm "is intended to be that of a partner in a partnership," with the same rights, privileges, and liabilities of partners, with some limitations.

One of the Agreement's limitations in the definition of "principals" is that principals "shall not contribute to or have any interest in the capital of the Firm other than their contributions to their Deposit Accounts, which shall constitute loans to the Firm that shall be subordinated to other debts of the Firm as and to the extent provided in the By-laws." Notwithstanding this definition, section 15.1 of the Agreement states that each member agrees that the relationship created between each member and the firm and between the firm's members "is intended to be that of a partner in a partnership," governed by the law, "both statutory and common law, respecting partners and partnerships."

The Agreement provides for the disposition of the deposit account in the event of death. It also provides for disposition of the deposit account on withdrawal and retirement and the effect of separation in the event of death, retirement, any nontemporary type of withdrawal, or bankruptcy. When a

member is "separated," the balance of his capital or deposit account, drawing account, and subordinated loan account "shall be liquidated and distributed to" him in exchange for his interest in the firm, and any amounts that he owes the firm at the time of separation "shall be paid prior to or simultaneously with payment" for the above accounts. The Agreement also provides, "Except as specifically provided for herein or in the By-laws, no Member shall . . . mortgage, assign[,] or incorporate his or her interest in the capital, goodwill[,] or profits of the Firm or any part thereof."

## B. Jessica's Expert

Jessica's valuation expert Mike Hill testified that the fair market value of Steven's KPMG partnership interest was $2.4 million[3] and that KPMG had goodwill "in excess of just the individual partners." Hill agreed that his August 23, 2011 valuation report stated, "This letter does not constitute a valuation report as defined by the Uniform Standards of Professional Appraisal Practices," and that it

---

[3]Hill stated that Steven owned a 0.124414 percent (essentially, a tenth of one percent) partnership interest in KPMG and that based on his compensation comparison for similar positions, Steven's reasonable compensation was $700,000, making $800,000 of Steven's $1.5 million average income attributable to the KPMG ownership interest. Applying a discount rate of around 33.3%, he arrived at the $2.4 million figure. Hill explained that a discount rate was the rate that he thought a willing buyer would expect to receive as a rate of return, and because this was excess income, "it requires a higher rate of return than, say, normal income-based salary and so forth." He also described the market for the share as "a specific type of buyer that would have the skill set to be able to step in and receive the salary plus the excess income." Hill also explained that he did not adjust for present value because the valuation covered a single period instead of a long-period discounted cash flow "out a number of years."

4

was not a complete valuation report. He also acknowledged that his valuation report did not mention the Agreement and that his valuation report referred to tangible value but did not use the words "good will" or make a distinction between commercial goodwill and personal goodwill. He agreed that his valuation result ignored the language in KPMG's offer letter that stated, "If you cease to be a member of KPMG, you will be entitled only to the compensation that has been earned and accrued through the date you cease to be a member of the firm." Hill also acknowledged that he never spoke to Steven.

## C. Steven's Testimony

Steven testified that the capital account was actually a deposit account. At the time of the divorce hearing, Steven listed the value of his KPMG capital account at $715,000, with a loan amount of $700,900 to fund it, for a net community interest of $14,100, and he testified that his interest in KPMG should be the net value of his capital account less the outstanding loan balance.

## D. Lauri Morrison's Testimony

Lauri Morrison, KPMG's national director in charge of partner care, gave the following testimony during her direct examination:

> Q. Jessica Hill, Steve Hill's wife, has a financial expert James M. Hill who stated that Steven Hill has a partnership interest of 0.124414 percent which is about one-tenth of one percent.
>
> What does that percentage number mean?
>
> A. That's the percentage of Steve's capital or deposit account; overall, the sum of all partners' capital deposit accounts as of 12/31/2010.

Q. And when you say "his capital account," are you talking about the gross number as opposed to the number after you subtract the loan?

A. Yes.

. . . .

Q. What is your understanding – does that percent – as to ownership interest, what does that percentage mean?

A. It doesn't represent any equity or ownership interest in the partnership.

Morrison said that under the Agreement, Steven did not have any ownership interest that could be sold, transferred, or given away by him or that could be inherited from him and that the Agreement defined his rights and the limitations on those rights. Morrison said that to enter KPMG as a principal, Steven had to pay into the capital account, that he had secured the loan through a third-party lender to fund the $715,000 in the capital account, and that his loan balance for the account was $700,900, for a difference of $14,100.[4] She explained that the loan's purpose was "[t]o help a partner or principal to fund their capital or deposit retirement" and that when a person entered KPMG as a partner or principal, he or she was required to pay a certain amount into the capital account.

---

[4]An August 18, 2011 letter from the KPMG partner in charge stated that if Steven voluntarily withdrew in August 2011 from KPMG, his principal deposit balance of $715,000 would be applied to pay off the outstanding principal balance (which at the time was $714,400), and Steven would receive a $600 payment in settlement of his deposit account balance.

## E.  Steven's Expert

Steven's expert Bryan Rice testified that one of the most important issues involving valuation in connection with a divorce was "[u]nderstanding if there can be—if there is any goodwill associated with an interest in a professional practice; and if so, is the goodwill attributed to what we commonly call personal goodwill or whether it's commercial goodwill."  Rice gave two definitions of goodwill:  the excess of a business's purchase price over the fair market value of its net assets and the present value of the economic benefits that accrue to a business interest or the owner of a business interest that is represented by returns on the business interest in excess of normal expectations.  He also divided goodwill into separate categories:  tangible value (patents, trademarks, copyrights, processes, location), commercial (the excess of value that someone would pay for the business without the seller signing a covenant not to compete), and personal (value that is attributable to the time, toil, talent, skills, efforts, and reputation of the owner-employee).

Rice testified that the value of Steven's interest was $14,100, the value of the capital account less the loan against it, and in his report, he stated, "I understand that the partnership interest and the income from it serves as collateral for the debt."  In his report, he also stated:

> A multi-owner professional practice may possess commercial goodwill when the firm is marketed and operated as a collection of individuals as opposed to a group of individual practices and/or has reached a critical mass of employees, market reach, shared knowledge, and business infrastructure.  Owners of such a practice

often own small minority interests in the firm and the impact of the departure of one minority partner from such a firm is generally not devastating to the entirety of the firm.

In his report, Rice opined that corporate governance is an extremely important factor in the valuation of interests in professional practices such as the KPMG interest.

Rice said that in making his valuation determination, he focused on the Agreement and the offer letter that Steven signed when he rejoined KPMG, and he stated,

[T]he only way to obtain value for your partnership interest is to sell it back to the firm. If it's a partnership interest; a member's interest; a principal's interest, you sell it back to the firm. You get the capital account, you pay off the debt[,] and that's what you get.

Rice had reviewed Hill's report and expressed that Hill's report was erroneous because "[h]e appraised what he concludes to be a minority interest, about one-tenth of one percent interest; but he did not apply or did not justify why he did not apply any discount for lack of control or discount for lack of marketability which, of course, are extremely standard." He further stated that the essence of Hill's valuation was to normalize Steven's compensation but that based on his own education and experience, "you do not make normalizing adjustments when you are appraising a minority interest because the owner of the minority interest has no power to enforce those types of normalizing adjustments." Rice also criticized Hill's report for failing to set forth a

8

methodology and for overstating value by applying the typical 33% cost of capital applicable to post tax benefit streams to Steven's pretax benefit stream.

Finally, Rice pointed out that Hill had not addressed the outstanding debt against the partnership interest and that Steven's August 13, 2003 offer letter stated,

> Your continuation as a member of the partnership and payment of compensation as described above is conditioned upon your satisfactory performance. For this purpose, your performance will be deemed satisfactory if you meet mutually agreed upon goals. If you cease to be a member of KPMG, you will be entitled only to compensation that has been earned and accrued through the date you cease to be a member of the firm.

Rice stated that he interpreted this to mean that Steven's performance is what drove his compensation.

Rice classified Steven's compensation as "his distributive share of the earnings of the firm, and most of that is reported as self-employment income which connotes effort in exchange for the earning of the compensation." Rice acknowledged that another component of Steven's compensation was "guaranteed payments which are also payments to a partner from—for services rendered. So it's all—he does receive some interest on his drawing account or capital account, as we call it, but that's minimal." Rice said that Steven was paid for his services, not for simply owning an interest in the entity, that Steven's performance "is what drives his compensation," and that based on his own compensation comparison and Steven's responsibilities, he had concluded that Steven's $1.5 million compensation was reasonable.

9

## F. Closing Arguments

During closing arguments, Jessica argued that KPMG was a partnership, not a corporation, that fair market value was the proper valuation, and that *Mandell v. Mandell*, 310 S.W.3d 531 (Tex. App.—Fort Worth 2010, pet. denied), *Von Hohn v. Von Hohn*, 260 S.W.3d 631 (Tex. App.—Tyler 2008, no pet.), and *Keith v. Keith*, 763 S.W.2d 950 (Tex. App.—Fort Worth 1989, no writ), were the cases that applied to determine her share of the community property with regard to Steven's partnership interest. Steven argued that Hill's valuation report was incomplete and nonstandard; that the "partnership interest" was really a set of contractual rights defined and limited by the Agreement; that those rights were not salable, transferable, or assignable; and that the amount in the capital account under the Agreement was $14,100.

## G. Trial Court's Rulings

The trial court found that "the partnership has a value of $14,000," and stated,

> Now, a couple of points just defined on the partnership valuation issue. I don't find that the contract controls. But what I do find is that the value attributable is all due to professional good will. I didn't see any commercial good will in this matter. Logic tells me there is some, but it's probably impossible to quantify. And even if there was, his ability to access it under the *Frank Finn*[5] decision, he couldn't except by being employed in the future. Such as if this firm were to liquidate at some point in the future, he might get some piece of the—of the value. I note in particular that the concurring opinion of Ann Stewart [in *Finn*] . . . .

[5]*Finn v. Finn*, 658 S.W.2d 735 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

She specifically noted you had to value the going concern of the partnership and then determine—which there was none of that here today, and then you have to determine whether there were conditions to getting it.

In the hearing on Jessica's motion for reconsideration, the trial court added that it did not find the methodology used by Jessica's expert appropriate for determining fair market value. In its findings of fact, the trial court stated that it had divided the community estate by allocating "approximately 50%" to each party.

## III. Marital Property

### A. Standard of Review

The trial court is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties. Tex. Fam. Code Ann. § 7.001 (West 2006); *Watson v. Watson*, 286 S.W.3d 519, 522 (Tex. App.—Fort Worth 2009, no pet.). It has broad discretion in making a just and right division, and absent a clear abuse of discretion, we will not disturb that division. *Halleman v. Halleman*, 379 S.W.3d 443, 452 (Tex. App.—Fort Worth 2012, no pet.).

### B. Valuation Standard

Jessica argues in part that the trial court incorrectly relied on *Mandell* instead of *Keith* to value the partnership interest because the Agreement addresses only when a member is leaving KPMG and does not purport to address the value of a member's interest on divorce or any other situation in which the member remains at KPMG. Jessica also argues that Steven's

11

valuation expert did not correctly apply the valuation method he urged the trial court to adopt because it ignored goodwill.

In *Mandell*, we contrasted earlier property division cases—*Von Hohn*, *Keith*, and *Finn*, which were cases in which partnership agreements did not address what would happen to a partnership interest in the event of divorce—with the valuation of a closely held corporation's stock.  310 S.W.3d at 540.  The corporation's shareholder agreement contained a specific contractual provision addressing stock ownership and value in the event of a shareholder's divorce and restrictions on who could own and purchase the stock as well as the price at which it could be sold.  *Id.*  While we agree that the older partnership-related cases appear more similar to the matter at hand,[6] we also note that the trial court expressly stated that with regard to the partnership valuation issue, "I don't find that the contract controls."

Jessica contends that goodwill is the key factor in valuing Steven's partnership interest and that the Agreement's restrictions should not be the sole method of establishing the value of his KPMG interest.  In terms of valuation, there is a distinction between the goodwill that attaches to a professional person because of confidence in that individual's skill and ability and the commercial

---

[6]We noted in *Mandell* that stock in a closely held corporation is not the same as an interest in an ongoing partnership and that increases in a partnership's value that accrue during the marriage may be a community asset while increases in a corporation's net worth generally are not an asset of the community estate of each of the corporation's shareholders.  310 S.W.3d at 539–40.

goodwill of a business that arises from its location, its well-established and well-recognized name, or something that otherwise separates it "from the skills or attributes of an individual member." *Salinas v. Rafati*, 948 S.W.2d 286, 290–91 (Tex. 1997).[7] "Good will that exists separate and apart from a professional's personal skills, ability, and reputation is divisible upon divorce." *Keith*, 763 S.W.2d at 952.

To determine whether goodwill that is subject to division upon divorce attaches to a professional practice, first, goodwill must be determined to exist independently of the personal ability of the professional spouse, and then if such goodwill is found to exist, the court must determine whether that goodwill has a commercial value in which the community estate is entitled to share. *Von Hohn*, 260 S.W.3d at 638; *see also Finn*, 658 S.W.2d at 741 (noting that it is "[w]ithout question [that] the goodwill of a long established firm has commercial value").

Steven testified that KPMG had approximately 1,900 partners and principals. This is similar, on a much grander scale, to the firm in *Finn*, in which there were twenty senior partners, twenty-two junior partners, and forty-three

---

[7]The supreme court cited *Geesbreght v. Geesbreght*, 570 S.W.2d 427 (Tex. Civ. App.—Fort Worth 1978, writ dism'd), as such an example. *Salinas*, 948 S.W.2d at 291. In *Geesbreght*, a doctor owned shares in a professional corporation that employed fifty to 100 other doctors on a part-time basis to satisfy the corporation's contracts with hospitals—accruing commercial goodwill—in addition to the professional goodwill that he accrued by providing medical services himself. 570 S.W.2d at 435–36. We concluded that when the contract relative to the sale or transfer of the owner-doctor's stock set its price at $50,000, the trial court abused its discretion by taking the stock's "book value" of $16,000. *Id.* at 436.

associates, and the firm itself, operating under the names of two founding partners no longer with the firm, had been providing legal services for over ninety years; the husband-lawyer had been practicing at the firm for around twenty-five years. 658 S.W.2d at 741 (noting that a large part of the firm's reputation for providing services was built upon the professional abilities of the husband's predecessors in the firm as well as the abilities of his present partners and professional employees). As here, the firm partnership agreement in *Finn* made no provision for compensating a senior partner for the firm's goodwill in the event of his death or withdrawal. *Id.* at 740, 742.

In contrast to the instant case, however, while the *Finn* court noted that the evidence in the case indicated that the husband's law firm had goodwill independent of his professional abilities, *see id.* at 741, the trial court here heard vague and conflicting evidence about the existence and availability of commercial goodwill with regard to Steven's interest in the firm. Specifically, Jessica's expert Hill testified that he did not make a distinction between personal and commercial goodwill in his valuation report. Steven's expert Rice defined the different types of goodwill and acknowledged that commercial goodwill could exist in a multi-owner professional practice but opined that corporate governance, i.e., the Agreement, was an "extremely important" factor in valuing a minority interest. Rice also stated that while Steven received "some interest" on his capital account outside of his guaranteed payments for services rendered, it was minimal, and had to be offset against the outstanding debt for the partnership interest. Rice

14

considered Steven's $1.5 million in compensation as reasonable, in comparison to Hill's testimony that $800,000 of Steven's compensation could be attributed to the ownership interest because his reasonable compensation was $700,000. To the extent, however, that the trial court had sufficient evidence upon which to conclude that commercial goodwill existed in some form, we continue our analysis to determine whether the trial court's division of the community's interest was "just and right." *See* Tex. Fam. Code Ann. § 7.001.

In analyzing whether the community estate was entitled to share in the value of the law firm's commercial goodwill, the majority in the *Finn* opinion stated that the extent of the husband's interest was governed by the partnership agreement. 658 S.W.2d at 741. The partnership agreement's terms did not provide for any compensation for accrued goodwill to a partner who ceased to practice law with the firm or any mechanism for him to realize the value of the firm's goodwill. *Id.* at 741–42. Instead, it provided only that if he died or withdrew, he (or his heir) was entitled only to the amount contained in his capital account, any earned income that had not been distributed, and his interest in the firm's reserve account, less 10% of his proportionate share in the accounts receivable for clients' disbursement. *Id.*

The majority concluded that the husband's lack of any legal right to realize the value of the firm's goodwill "is a decisive factor," making the case distinguishable from *Geesbreght*, "wherein the corporate structure provided a mechanism which enabled Dr. Geesbreght to realize the value of accrued

15

goodwill by enhancing the value of his stock." *Id.* at 742. The husband in *Finn* could only realize the value of accrued goodwill in the partnership by continuing to practice law as a member of the firm, "a circumstance depending not only on his own individual capacity, but also on the uncontrolled discretion of his partners." *Id.* The majority held that such realization in the future was "no more than an expectancy entirely dependent on the husband's continued participation in the firm, and therefore, [was] not property in the community estate." *Id.* (comparing husband's position to the physician-spouse in *Nail v. Nail*, 486 S.W.2d 761, 764 (Tex. 1972), in which the supreme court concluded that the goodwill that the medical practice might have accrued at the time of the divorce was not property in the parties' estate).

However, in a concurring opinion, Justice Stewart disagreed that the value of the law firm's goodwill should not be considered in evaluating the community's partnership interest because the goodwill enhanced the value of the community partnership interest. *Id.* at 749 (Stewart, J., concurring). Justice Stewart found *Geesbreght* more analogous than *Nail* because the goodwill did not belong to the individual partners, and she disagreed that the partnership agreement controlled the value of individual partnership interests because "[t]he asset being divided is the husband's interest in the partnership as a going business, not his contractual death benefits or withdrawal rights." *Id.* She therefore concluded that while the formula in the partnership agreement might represent the present value of the husband's interest, it should not preclude a consideration of other facts, including

16

consideration of partnership goodwill, if any. *Id.* (noting that whether the law firm possessed goodwill, and if so, its value were fact questions for the trier of fact).

We have previously followed Justice Stewart's concurring opinion. *Keith*, 763 S.W.2d at 953 (citing 658 S.W.2d at 749 (Stewart, J., concurring)). In *Keith*, the partnership agreement provided a method for determining the value of the business in the event that it was terminated due to withdrawal, other act, or death of one of the partners. *Id.* We concluded that because the partnership was not being terminated, "the formula set forth in the partnership agreement with respect to death or withdrawal of the partner is *not necessarily determinative* of the value of a spouse's interest in the ongoing partnership as of the time of divorce." *Id.* (emphasis added); *see also Von Hohn*, 260 S.W.3d at 634, 640 (following *Finn* concurrence in holding that husband's law firm partnership agreement did not control value of individual partnership interests in divorce).

But while the Agreement is only a factor to consider in the present value of the partnership interest here, *see Keith*, 763 S.W.2d at 953; *Finn*, 658 S.W.2d at 749 (Stewart, J., concurring), as noted by Justice Stewart, the questions of whether a business possesses goodwill and if so, what the value of that goodwill consists of, are fact questions for the trier of fact—in this case, the trial court. *See Finn*, 658 S.W.2d at 749 (Stewart, J., concurring). Based on the evidence presented to the trial court, if it determined that Jessica's expert lacked credibility and chose to believe the testimony of Steven's expert and the testimony of Morrison, the KPMG national director in charge of partner care, about the status

17

of the partnership interest,[8] then it could have reasonably reached the conclusion that it did—that the partnership interest had the lower value testified about by Steven and his expert, and that commercial goodwill, if any, was presently inaccessible based on, among other things, the status of the loan that Steven had taken out to buy into the firm, but that it might have value someday, in the post divorce future.[9]  Therefore, we overrule this portion of Jessica's two issues.

Jessica further argues that by failing to account for the "guaranteed compensation component" in the partnership agreement, the trial court incorrectly reduced the community estate by $336,985 and reduced her interest by $168,492, resulting in an unjust and unfair property division.  However, as pointed out by Steven during oral argument and based on our review of the record, Jessica did not raise this argument in the trial court below.  Therefore, it

---

[8]The divorce decree specifically awarded to Steven "[a]ll interest he *may* own in the partnership known as KPMG, LLP., including his capital account with KPMG, LLP.," along with the loan against that capital account. [Emphasis added.]

[9]The trial court also noted, and the record supports, that neither of the parties nor their witnesses testified about the value of the partnership itself as a going concern.  In *Von Hohn*, the wife's expert valued the husband's interest in the firm using an income approach, including the firm's commercial goodwill but excluding personal goodwill and future time, toil, and labor, and the jury valued the husband's interest at $4.5 million.  260 S.W.3d at 641.  The Tyler court nonetheless reversed the portion of the divorce decree pertaining to the division of the marital estate because the jury's goodwill finding included pending, future earnings post divorce, which were the husband's separate property.  *Id.* at 641–43.

is unpreserved.[10]  *See* Tex. R. App. P. 33.1; *Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997).  We overrule the remainder of her two issues.

## IV.  Conclusion

Having overruled both of Jessica's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, MCCOY, AND MEIER, JJ.

DELIVERED:  January 9, 2014

---

[10]We also note that Steven's expert Rice explained that Steven was paid for his services and that his compensation came in the "form of his distributive share of the earnings of the firm," most of which was reported as "self-employment income" and another component of which involved "guaranteed payments which are payments to a partner from – for services rendered," in the form of minimal interest on his capital account.  The Agreement defined "guaranteed compensation" as "a payment or payments made to a Member, without regard to the income of the Firm, *for services rendered to the Firm*." [Emphasis added.]

19