Elaine S. SORENSEN, Plaintiff
and Respondent,

v.

Clifford G. SORENSEN, Defendant
and Appellant.

No. 870102–CA.

Court of Appeals of Utah.

Feb. 10, 1989.

Rehearing Denied March 23, 1989.

Kent Kasting, Salt Lake City, for appellant.

Reid E. Lewis and Jeffrey Robinson, Salt Lake City, for plaintiff and respondent.

Before GARFF, BILLINGS and JACKSON, JJ.

BILLINGS, Judge:

In this divorce action, defendant/appellant, Clifford G. Sorensen ("Dr. Sorensen") appeals the trial court's property valuation and distribution, award of attorney fees to Mrs. Sorensen, and the allocation of expert witness fees. We affirm the property distribution and allocation of expert witness fees but reverse the award of attorney fees.

## FACTS

The parties were married on April 10, 1975. Mrs. Sorensen was a registered nurse. Dr. Sorensen was a dentist and had practiced in Roy, Utah for approximately six years prior to the marriage. The parties have four children, ages 10, 9, 6, and 3 at the time of trial. There is no dispute as to custody, child support, or alimony.

During the marriage, Dr. Sorensen continued to practice as a dentist in Roy. Mrs. Sorensen returned to school and received her masters degree in nursing and also completed all the necessary courses for a Ph.D. in public health.

At trial, Mrs. Sorensen claimed Dr. Sorensen's dental practice, a professional corporation, was a marital asset subject to valuation and distribution by the court. Mrs. Sorensen called Dr. Richard Austin as an expert witness. Dr. Austin had been a dentist in Utah for four and one-half years. Dr. Austin also worked for a Denver company that brokered the purchase and sale of dental practices. His brokerage company had appraised and sold approximately 250 dental practices. Dr. Austin had participated in 12 appraisals and 7 sales of dentistry practices. Six of the 7 sales occurred in the Salt Lake City area.

Dr. Austin testified that the fair market value of Dr. Sorensen's dental practice was $100,060 and that dental practices in Utah generally sold for 90 to 95 percent of their appraised value. In connection with his testimony, Dr. Austin presented the trial court his written valuation of Dr. Sorensen's dental practice. Dr. Austin's valuation was based on unaudited information previously provided by Dr. Sorensen through discovery. Dr. Austin's calculation was the combined value of three components: 1) tangible assets, i.e., furniture and equipment—$15,330, 2) accounts receivable—$22,170,[1] and 3) intangible assets or "goodwill"—$62,560, for a total market value of $100,060. Dr. Austin further testified "[i]t is important to realize that this evaluation has been made [according to] the standards that are currently acceptable for this purpose. Existing market trends in the state of Utah for the disposition of dental practices were given consideration."

To determine the goodwill value, Dr. Austin reviewed the income and expenses of Dr. Sorensen's practice for a three year period, 1983 through 1985. During this time, Dr. Sorensen averaged $184,000 in gross receipts. Dr. Austin testified that the "goodwill" value of dental practices he had appraised in Utah ranged from 15 to 80 percent of their gross receipts depending on a number of factors. These factors include: the length the practice had been operating, location, number of patients, profitability, currency of accounts receivable, and an evaluation of the transferability of profit to a prospective buyer. Applying the foregoing factors to Dr. Sorensen's practice, Dr. Austin concluded the goodwill value was 34 percent of the gross receipts for a total of $62,560. Specifically, Dr. Austin testified:

The age of a dental practice plays an important role in determining its value. Dr. Sorensen has been practicing in the community for a number of years and has established a good reputation for family dental care. The number of patients of record and the maintenance of healthy production figures attest to this. Dr. Sorensen's practice location is on a very highly traveled street and is in an excellent location for visibility and public exposure. Parking is convenient. The office space is adequate and functional. However, updating equipment and leasehold improvements would increase the value of this practice.

The aging of the accounts receivable indicates that the practice has a healthy collection policy and that the receptionist is doing a good job of collecting.

The community of Roy has a healthy, growing economy. The influx of new dentists into the area quickly absorbs patients seeking new dentists.

In response to Dr. Austin's testimony, Dr. Sorensen called two expert witnesses: Mr. Gerald Deters, his accountant, and Mr. Roger Nuttal, a CPA. Mr. Deters compared the respective income, expenses, and profit of Dr. Sorensen's dental practice for the years 1974 and 1986, and concluded that since the date of the marriage, Dr. Sorensen's practice was "a little bit bigger, a little better." Mr. Deters further testified that goodwill had never been shown as an asset of Dr. Sorensen's professional corporation.

Dr. Sorensen also called Mr. Roger Nuttal, who evaluated the Sorensen's entire financial situation, both business and personal. Mr. Nuttal testified that he believed some goodwill existed, but found Dr. Austin's calculations "very questionable." He further testified that Dr. Austin failed to consider $10,129 in accounts payable. Thereafter, relying primarily on Dr. Austin's calculations less the amount for accounts payable, Mr. Nuttal testified that Dr. Sorensen's dental practice was worth approximately $87,096.

With reference to the dental practice, the trial court concluded with our emphasis:

[D]efendant has continued to practice dentistry in Roy, Utah, during the course of the marriage and has an office with an

---

1. To arrive at a dollar value attributable to accounts receivable, Dr. Austin excluded all accounts unpaid over 120 days, and discounted the resulting amount by 12 percent to account for uncollectibles.

excellent location; has continued to build his clientele; has a good fee collection record and a good reputation in the community.

The Court finds the total value of the practice to be $100,000 including accounts receivable and all equipment with the exception of the computer.

That dental practices usually sell for approximately 90 percent of the appraised value....

.    .    .    .    .

The defendant should be awarded the dental practice including all equipment and accounts receivable *the Court feeling that the large portion of the value of the practice has to do with good will and reputation built up in the practice over the years of marriage.* The only reasonable way to value said practice is to proportion it based upon the years the parties have been married during the practice. Based on their eleven years of marriage over sixteen years of practice for the purpose of distribution, the Court values the practice at 69 percent of the value as found above for a total of $62,-100.

The trial court then ordered essentially an equal division of the parties' property crediting $62,100 to Dr. Sorensen for his practice and an equal amount of offsetting property to Mrs. Sorensen.

The trial court also ordered Dr. Sorensen to contribute $2,000 toward Mrs. Sorensen's attorney fees. Mrs. Sorensen testified she had incurred fees, but she had no present income to pay those fees. Mrs. Sorensen's attorney proffered an exhibit reflecting the time spent and the rates charged. Dr. Sorensen's counsel stipulated that the proffer could be received but expressly refused to stipulate that the fees were reasonable.

The trial court also ordered the parties to bear the expense of their own expert witnesses, with the exception of Allan Heiskanen, a real estate appraiser, whose fees the parties were ordered to split. The Sorensens, by pretrial stipulation, agreed to have their real property appraised by Mr. Heiskanen. The stipulation provided that the expense of the appraiser was to be paid initially by Dr. Sorensen with the ultimate responsibility for payment to be determined by the trial court.

Dr. Sorensen raises three issues on appeal. First, he claims the trial court erred in its valuation of his dental practice by, 1) determining that "goodwill" was a marital asset subject to equitable distribution, 2) including Dr. Sorensen's accounts receivable in the valuation of the dental practice, and 3) failing to consider accounts payable in its evaluation of the practice. Second, Dr. Sorensen claims the trial court erred in awarding Mrs. Sorensen a portion of her attorney fees. Finally, Dr. Sorensen claims the trial court erred by ordering him to pay a portion of Mr. Heiskanen's expert witness fee.

## I. VALUATION OF DENTAL PRACTICE

■ In a divorce proceeding, "determining and assigning values to marital property is a matter for the trial court and this Court will not disturb those determinations absent a showing of clear abuse of discretion." *Talley v. Talley,* 739 P.2d 83, 84 (Utah Ct.App.1987). "In making such orders, the trial court is permitted broad latitude, and its judgment is not to be lightly disturbed, so long as it exercises its discretion in accordance with the standards set by this Court." *Newmeyer v. Newmeyer,* 745 P.2d 1276, 1277 (Utah 1987) (citations omitted). An appealing party bears the burden of establishing that the trial court violated those standards "or that the trial court's factual findings upon which the [property] division is grounded are clearly erroneous under Utah Rule of Civil Procedure 52(a)." *Id.* Furthermore, assessing the weight and credibility of expert witness testimony is a matter for the trier of fact. *See Yelderman v. Yelderman,* 669 P.2d 406, 408 (Utah 1983) ("it is within the province of the fact finder to believe those witnesses or evidence it chooses").

### *Goodwill*

■ In its property distribution, the trial court credited Dr. Sorensen with $62,100

which represents the trial court's assessment of the total value of Dr. Sorensen's dental practice. As part of its calculations, the trial court assigned a substantial value to the goodwill of Dr. Sorensen's professional dental corporation. On appeal, we must first determine whether goodwill is properly considered a marital asset subject to distribution, and if so, whether there is competent evidence to support the trial court's finding as to the goodwill value of Dr. Sorensen's professional corporation.

In a divorce action, trial courts should distribute marital property and income in order that "the parties may readjust their lives to their new circumstances as well as possible." *Gardner v. Gardner*, 748 P.2d 1076, 1078 (Utah 1988) (citations omitted). "[M]arital property 'encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived....' " *Id.* at 1079 (citation omitted). The Utah Supreme Court has emphasized:

> [W]hether a resource is subject to distribution does not turn on whether the spouse can presently use or control it, or on whether the resource can be given a present dollar value. *The essential criterion is whether a right to the benefit or asset has accrued in whole or in part during the marriage.*

*Woodward v. Woodward*, 656 P.2d 431, 432–33 (Utah 1982) (emphasis added).

The question of whether the goodwill of a professional corporation is a marital asset, properly subject to equitable distribution in a divorce action, is one of first impression for this Court,[2] although the Utah Supreme Court recently addressed

the issue indirectly in *Gardner v. Gardner*, 748 P.2d 1076 (Utah 1988). In *Gardner*, the trial court awarded Dr. Gardner his retirement account and medical assets without assigning them a present value. The Utah Supreme Court reversed the trial court's decision, and remanded for further proceedings for a valuation of the medical assets and retirement account. In considering the valuation and distribution of the doctor's medical assets, the Court stated "[t]he ability of a business to generate income from its continued patronage is commonly referred to as good will. *Good will is properly subject to equitable distribution upon divorce." Id.* at 1080 n. 1 (citations omitted) (emphasis added). The dissent chastises us for our reliance on the language in *Gardner* claiming Justice Stewart intended to limit his endorsement of goodwill as a marital asset to multi-membered professional corporations. However, Justice Stewart does not make a distinction as to the "type" of business entity and in fact, in *Gardner*, the Utah Supreme Court relied on *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1 (1983), and *In re Marriage of Fleege*, 91 Wash.2d 324, 588 P.2d 1136 (1979), to support its conclusion that the goodwill of a professional corporation is subject to distribution in a divorce proceeding. *See Gardner*, 748 P.2d at 1080 n. 1. Both decisions involved solely owned or operated professional practices.

The prevailing view among 20 other jurisdictions is that the goodwill of a professional practice or business is a marital asset, subject to valuation, and therefore, should be considered in a divorce proceeding.[3] Jurisdictions holding to the contrary

---

2. In *Stevens v. Stevens*, 754 P.2d 952 (Utah Ct. App.1988), Judge Jackson, writing for this Court, found that the appellant confused "goodwill" with "going concern value," and failed to prove the *existence* of goodwill by competent evidence. *Id.* at 956–57.

3. *See, e.g., Rostel v. Rostel*, 622 P.2d 429 (Alaska 1981), *rev'd on other grounds*, 749 P.2d 343 (Alaska 1988) (close corporation—husband and wife sole shareholders); *Mitchell v. Mitchell*, 152 Ariz. 317, 732 P.2d 208 (1987) (partnership); *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640 (1987) (professional corporation); *In re Marriage of Watts*, 171 Cal.App.3d 366, 217 Cal.Rptr.

301 (1985) (professional corporation); *In re Marriage of Nichols*, 43 Colo.App. 383, 606 P.2d 1314 (1979) (professional association); *Wright v. Wright*, 469 A.2d 803 (Del.Fam.Ct.1983) (sole practitioner); *In re Marriage of White*, 98 Ill. App.3d 380, 53 Ill.Dec. 786, 424 N.E.2d 421 (1981) (professional corporation); *Heller v. Heller*, 672 S.W.2d 945 (Ky.Ct.App.1984) (professional corporation); *Kowalesky v. Kowalesky*, 148 Mich.App. 151, 384 N.W.2d 112 (1986) (professional corporation); *Roth v. Roth*, 406 N.W. 2d 77 (Minn.Ct.App.1987) (sole practitioner); *Hanson v. Hanson*, 738 S.W.2d 429 (Mo.1987) (partnership); *In re Marriage of Hull*, 712 P.2d 1317 (Mont.1986) (professional corporation);

include Kansas, Louisiana, Missouri, Pennsylvania, Wisconsin, Texas, and Tennessee.[4]

The most common legal definition describes "goodwill" as:

> [T]he advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.[5]

In the accounting field, goodwill is referred to generally as " 'the summation of all the special advantages, not otherwise identifiable, related to a going concern. It includes such items as a good name, capable staff and personnel, high credit standing, reputation for superior products and services, and favorable location.' "[6]

"There can be no doubt that goodwill exists. It is a legally protectable interest."[7] Goodwill has been held to constitute "property" within the meaning of the fourteenth amendment due process clause[8] and is subject to being bought and sold.[9] Goodwill may be present whether the business form is a sole proprietorship, partnership,[10] association, joint venture, or corporation.[11]

*Taylor v. Taylor,* 222 Neb. 721, 386 N.W.2d 851 (1986) (professional corporation); *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1 (1983) (sole practitioner); *Hertz v. Hertz,* 99 N.M. 320, 657 P.2d 1169 (1983) (professional corporation); *Dorton v. Dorton,* 77 N.C.App. 667, 336 S.E.2d 415 (1985); *Jondahl v. Jondahl,* 344 N.W.2d 63 (N.D. 1984) (sole practitioner); *In re Marriage of Reiling,* 66 Or.App. 284, 673 P.2d 1360 (1983) (sole practitioner); *Fait v. Fait,* 345 N.W.2d 872 (S.D. 1984) (professional association); *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175 (1984) (professional corporation).

**4.** *See, e.g., Powell v. Powell,* 231 Kan. 456, 648 P.2d 218 (1982); *Pearce v. Pearce,* 482 So.2d 108 (La.Ct.App.1986) (expert testimony *failed to prove* sole proprietorship had goodwill value); *Carter v. Carter,* 616 S.W.2d 543 (Mo.Ct.App. 1981); *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986); *Holbrook v. Holbrook,* 103 Wis. 2d 327, 309 N.W.2d 343 (Ct.App.1981); *Nail v. Nail,* 486 S.W.2d 761 (Tex.1972) (no goodwill in sole proprietorship). *But see Geesbreght v. Geesbreght,* 570 S.W.2d 427 (Tex.Civ.App.1978) (goodwill of *professional corporation* is marital asset). *See also, Smith v. Smith,* 709 S.W.2d 588 (Tenn.Ct.App.1985).

**5.** Comment, *Identifying, Valuing, and Dividing Professional Goodwill or Community Property at Dissolution of the Marital Community,* 56 Tul.L. Rev. 313, 314 (1981) (quoting J. Story, Commentaries on the Law of Partnerships § 99, at 170 (6th ed. 1868)). *See also Hanson v. Hanson, Mitchell v. Mitchell: The Division of Professional Goodwill Upon Marital Dissolution,* 11 Harv. Women's L.J. 147, 149 (1988); and *Jackson v. Caldwell,* 18 Utah 2d 81, 415 P.2d 667, 670 (1966).

**6.** *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 4 (1983) (quoting J.M. Smith and K.F. Skousen,

*Intermediate Accounting* 283 (7th ed. standard vol. 1982)).

**7.** *Dugan,* 457 A.2d at 4.

**8.** *McDermott v. City of Seattle,* 4 F.Supp. 855, 857 (D.Wash.1933) (and citations therein).

**9.** *Jackson v. Caldwell,* 18 Utah 2d 81, 415 P.2d 667, 670 (1966).

**10.** In *Mitchell v. Mitchell,* the Arizona Supreme Court noted that there is confusion in this area of the law, partly because the analysis of whether goodwill should be considered an asset often involves the dissolution of a partnership which is sometimes controlled by a partnership agreement, as opposed to the dissolution of a marriage. 152 Ariz. 317, 732 P.2d 208, 211 (1987). The Arizona Court described the dissolution of a marriage as follows:

> A professional practice goes automatically to the spouse licensed to practice it. He is not selling out or liquidating, but continuing in business. Effectively, it is the case of the silent partner withdrawing from a going business. And, if such partner is to receive fair compensation for her share, or her enforced retirement, it should be so evaluated.

*Id.*

Such is the case in *Jackson v. Caldwell,* authority relied on by Dr. Sorensen for the proposition that goodwill should not be considered marital property subject to distribution in divorce proceedings. *See Jackson,* 415 P.2d at 670–71.

**11.** *See, e.g., Dugan,* 457 A.2d at 4; *Mitchell,* 732 P.2d at 210–11; *Heller v. Heller,* 672 S.W.2d 945, 947 (Ky.Ct.App.1984); *Hanson v. Hanson,* 738 S.W.2d 429, 435 (Mo.1987).

The overwhelming majority of jurisdictions considering the issue find that goodwill is a property interest, and as such, it must be considered in divorce proceedings. Whether goodwill exists and has value in a particular case, is a question of fact. Accordingly, we agree with the majority of jurisdictions and the dicta in *Gardner v. Gardner*, and hold that the goodwill of a professional practice is a marital asset subject to valuation and distribution in the appropriate circumstances.

Judge Jackson, in his dissent, criticizes the approach taken by the Washington and California courts in valuing goodwill before they address whether it exists at all. Judge Jackson adamantly asserts that any approach to valuing goodwill should involve a two-step inquiry: does goodwill exist in this particular entity, and if so, what is its value. Although some courts do go directly to the valuation issue, a conclusion that a value exists implicitly answers the first inquiry in the affirmative. More importantly, however, we think our opinion clearly directs trial courts to engage in the two-part approach.

We concede that there is a split of authority on this issue, but we find those jurisdictions holding to the contrary unpersuasive. Courts that refuse to recognize goodwill as a marital asset base their conclusions, generally, on three grounds. First, opponents contend that goodwill is not an asset separate and apart from the individual practitioner and in this respect, goodwill is analogous to a professional degree.[12] Second, they claim that goodwill is

indistinguishable from future earning capacity and is valuable to the individual only to the extent that it assures substantial earnings in the future.[13] Finally, opponents assert that goodwill is difficult to value, hence it should not be considered in divorce settlements.[14] We address each of these arguments separately.

In *Holbrook v. Holbrook*, the Wisconsin Supreme Court expressed the view that goodwill does not "bestow on those who have an ownership interest in the business, an actual, separate property interest." 103 Wis.2d 327, 309 N.W.2d 343, 354 (Ct.App. 1982). Accordingly, the Wisconsin Court determined that goodwill is more analogous to a professional degree than a property interest. *Id.*

We disagree with Wisconsin's rationale. There are significant and distinctive differences between the goodwill of a professional practice and a professional degree.[15] Unlike a professional degree, goodwill is traditionally defined as an intangible *"property right."*[16] It is a separate and distinct asset, not merely a factor contributing to the earning capacity of the practitioner. *See In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 178 (1984). The theory underlying goodwill is that an ongoing business has a value beyond mere tangible assets. These intangible assets are independent of the proprietor, and as such, can be sold on an open market. *In re Marriage of Nichols*, 43 Colo.App. 383, 606 P.2d 1314, 1315 (1979). In *Nichols*, the Colorado Court of Appeals stated:

---

**12.** *See Powell v. Powell,* 231 Kan.App.2d 456, 648 P.2d 218, 223 (1982); *Holbrook v. Holbrook,* 103 Wis.2d 327, 309 N.W.2d 343, 354 (Ct.App. 1981); *Nail v. Nail,* 486 S.W.2d 761, 764 (Tex. 1972).

**13.** *See Powell,* 648 P.2d at 223; *Holbrook,* 309 N.W.2d at 354; *Nail,* 486 S.W.2d at 764.

**14.** *See, e.g., Holbrook,* 309 N.W.2d at 354.

**15.** *See, e.g., Mitchell v. Mitchell,* 152 Ariz. 317, 732 P.2d 208, 211 (1987); *In re Marriage of Nichols,* 43 Colo.App. 383, 606 P.2d 1314, 1315 (1979); *Heller v. Heller,* 672 S.W.2d 945, 948 (Ky.Ct.App.1984); *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 6 (1983).

**16.** *See, e.g., In re Marriage of Nichols,* 606 P.2d at 1315. In addition to those authorities holding that goodwill is a marital asset, *see* note 3, *supra,* even those jurisdictions holding to the contrary, nonetheless find that *good will is a property interest. See, e.g., Powell v. Powell,* 231 Kan. 456, 648 P.2d 218, 222 (1982); *Nail v. Nail,* 486 S.W.2d 761, 763 (Tex.1972); *Beasley v. Beasley,* 518 A.2d 545, 552 (Pa.Super.1986); *Pearce v. Pearce* 482 So.2d 108, 111 (La.Ct.App.1986). Instead, these cases typically find that the particular facts did not demonstrate that the goodwill had value, and therefore, goodwill per se should not be considered a marital asset. *See Powell,* 648 P.2d at 222–24; *Nail,* 486 S.W.2d at 764; *Beasley,* 518 A.2d at 552; *Pearce,* 482 So.2d at 111.

While we recognize that professional goodwill is not an asset which has an independent market value, it can, in conjunction with the assets of the practice, be sold. This limited marketability distinguishes professional goodwill from the advanced educational degree, which, because it is personal to its holder and is non-transferable, [is] held not to be property....

*Id.*

When goodwill exists, it may well be regarded as "the most lucrative asset of some enterprises." [17]

It is the property attributes of goodwill that distinguish it from a professional degree, which we have held on prior occasions does not constitute marital property subject to distribution.[18]

Several courts have found that "[t]he better analogy is to pension rights which are marital property." *Mitchell v. Mitchell,* 152 Ariz. 317, 732 P.2d 208, 211 (1987) (and citations therein). Both are property rights acquired during the marriage although their enjoyment and benefits are deferred. *Id.* Our Supreme Court has stated that marital property encompasses pension funds. *Gardner v. Gardner,* 748 P.2d 1076, 1079 (Utah 1988); *Woodward v. Woodward,* 656 P.2d 431, 432 (Utah 1982).

In *Woodward,* the Court declared with our emphasis:

[Appellant's] argument fails to recognize that pension or retirement benefits are a form of deferred compensation by the employer. *If the rights to those benefits are acquired during the marriage, then the court must at least consider those benefits in making an equitable distribution of the marital assets.* The *right* (emphasis in the original) to receive monies in the future is unquestionably ... an economic resource, subject to equitable distribution based upon proper computation of its present dollar value.' [19]

Similarly, if goodwill can be shown by competent credible evidence to exist at the time of dissolution and that it was acquired or accrued during the marriage, trial courts must "at least consider those benefits in making an equitable distribution of the marital assets." *Id. See also In re Marriage of Lopez,* 38 Cal.App.3d 93, 113 Cal. Rptr. 58, 68 (1974).

The second major criticism of treating goodwill as a marital asset is that goodwill is indistinguishably tied to personal future earnings. Thus, if the practitioner dies or retires, "nothing remains." [20]

We believe to the contrary. We note at the outset, that goodwill is and must be distinguished from a professional practitioner's future earning capacity, an issue more fully addressed below. A number of jurisdictions have held that goodwill is not, however, per se synonymous with future earning capacity.[21]

In addition to those jurisdictions, one commentator opined that "[t]here is no val-

---

17. *Dugan,* 457 A.2d at 5. *See also In re Marriage of Goger,* 27 Or.App. 729, 557 P.2d 46, 47 (1976).

18. *See Rayburn v. Rayburn,* 738 P.2d 238 (Utah Ct.App.1987); *Petersen v. Petersen,* 737 P.2d 237 (Utah Ct.App.1987). In *Petersen,* we held that an educational degree is not encompassed within the broad views of the concept of "property." 'It does not have an exchange value or any objective transferable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred, conveyed, or pledged.... It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view it has none of the attributes of property in the usual sense of that term.' 737 P.2d at 240 (quoting *In re Marriage of Graham,* 194 Colo. 429, 574 P.2d 75, 77 (1978)).

19. *Woodward,* 656 P.2d at 432 (quoting *Kikkert v. Kikkert,* 177 N.J.Super. 471, 427 A.2d 76, 78 (1981), *quoting Kruger v. Kruger,* 73 N.J. 464, 375 A.2d 659, 662 (1977)), *aff'd,* 88 N.J. 4, 438 A.2d 317 (1981).

20. *Powell v. Powell,* 231 Kan. 456, 648 P.2d 218, 223 (1982). *See also, Holbrook v. Holbrook,* 103 Wis.2d 327, 309 N.W.2d 343, 354 (Ct.App.1981) (goodwill is valuable only to the extent that it assures continued substantial future earnings).

21. *See, e.g., Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 6 (1983); *In re Marriage of Lopez,* 38 Cal.App.3d 93, 113 Cal.Rptr. 58, 67 (1974); *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 178 (1984).

id basis for the argument that since goodwill is essentially a measure of future earnings, it cannot properly be treated as a marital asset...." 2 *Valuation and Distribution of Marital Property*, § 23.05[2] at 23–69 (1988). The commentator further declared that "[i]t is an economic truism that the value of any income-producing asset is its capacity to produce future income. In this regard, goodwill is just like any other asset. Goodwill differs only insofar as, unlike a stock or bond, it will not produce income by itself." *Id.*

The argument that goodwill disappears in a case where the practitioner dies or retires is also unpersuasive. The possibility of continued patronage, despite the absence of the selling practitioner, has present value to a prospective buyer of a professional practice. *See In re Marriage of Nichols*, 43 Colo.App. 383, 606 P.2d 1314, 1315 (1979). Moreover, the value of goodwill frequently remains notwithstanding the practitioner's death, resignation, or disability. *See In re Marriage of White*, 98 Ill.App.3d 380, 53 Ill.Dec. 786, 789, 424 N.E.2d 421, 424 (1981). "If it were otherwise, we are unable to conceive the basis for the popular practice of retaining the names of deceased or withdrawn members in many professional firms long after their death or withdrawal." *Id.* The possibility of death or retirement of the practitioner may reduce the value of goodwill, but it does not in all circumstances eliminate its existence. *In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 178 (1984).

> When a professional retires or dies, his earning capacity also either retires or dies. Nevertheless, the goodwill that once attached to his practice may continue in existence in the form of established patients or clients, referrals, trade name, location and associations which now attach to former partners or buyers of the practice.... [A] professional can transport all of his skill (earning capacity) to a new town, but patients or clients, reputation and referrals (goodwill) cannot always be transported.

*Id.* If the facts in a particular case demonstrate that there is no goodwill value remaining in the absence of the practitioner, then a trial court may properly declare in its determination of a practice's worth, that there is no value attributable to goodwill.

The third and most unpersuasive argument is that goodwill is difficult to value, therefore, it should not be considered in the distribution of marital assets. *See, e.g., Holbrook v. Holbrook*, 103 Wis.2d 327, 309 N.W.2d 343, 354 (Ct.App.1981). This also seems to be the position taken by the dissent.

We concede that in some cases, valuing goodwill is difficult. Even so, if a party's expert witness cannot adequately demonstrate that goodwill has a present value, then there is simply an evidentiary defect and goodwill should not be considered. However, the mere fact that goodwill may be difficult to value or elusive in nature, does not justify ignoring or disregarding it altogether in the valuation of marital property. *In re Marriage of Nichols*, 43 Colo. App. 383, 606 P.2d 1314, 1316 (1980); *Mitchell v. Mitchell*, 152 Ariz. 317, 732 P.2d 208, 211 (1987). As in *Mitchell*, "[w]e prefer to accept the economic reality that the goodwill of a professional practice has value, and it should be treated as property upon dissolution of the community, regardless of the form of business." *Mitchell*, 732 P.2d at 212. We are mindful that not every professional practice necessarily has goodwill. *See, e.g., In re Marriage of Hall*, 692 P.2d at 179. Some courts, however, hold that sole proprietorships per se do not have goodwill because the business's existence depends exclusively on the professional spouse's continuing efforts. *See, e.g., Nail v. Nail*, 486 S.W.2d 761 (Tex.1972). We are not prepared to rule so broadly. Instead, we emphasize that the issue is one of proof, and not the particular form the business takes. "It would be inequitable to hold that the form of the business enterprise can defeat the community's interest in the professional goodwill. Such a result ignores the contribution made by the non-professional spouse to the success of the professional...." *Mitchell*, 732 P.2d at 211.

## Valuation of Goodwill

Because we find that the goodwill of Dr. Sorensen's dental practice was properly considered by the trial court in its property distribution, we next address Dr. Sorensen's contention that the trial court erred in the value it ultimately placed on the goodwill of his dental practice.

■ "It is a difficult task at best to arrive at a value for the intangible component of a professional practice attributable to goodwill." *Mitchell v. Mitchell*, 152 Ariz. 317, 732 P.2d 208, 214 (1987). The valuation of goodwill is a question of fact and is dependent upon the particular circumstances.[22] In order to establish that the goodwill of a divorcing spouse's professional practice is a marital asset, a party must produce sufficient expert testimony to show that the goodwill constitutes a valued business asset, independent of the continued presence of the professional spouse.[23] Trial courts may consider any legitimate valuation method "that measures the present value of goodwill by taking into account past results, and not post-marital efforts of the professional spouse...." *Poore v. Poore*, 75 N.C.App. 414, 331 S.E.2d 266, 271 (1985).

Factors courts have frequently found to affect the value of goodwill include:

> [T]he age, health, and professional reputation of the practitioner, the nature of the practice, the length of time the practice has been in existence, its past profits, its comparative professional success, and the value of its other assets.[24]

Similarly, the Oregon Court of Appeals observed that the value of goodwill may be shown in a number of ways. " 'Elements which may be considered are, length of time the business has been in existence; the nature and character of the business; its success or lack thereof; its average profits; and the probability of its continuance under the same name.' " *In re Marriage of Goger*, 27 Or.App. 729, 557 P.2d 46, 47 (1976) (quoting *Levene v. City of Salem*, 191 Or. 182, 229 P.2d 255, 263 (1951)). " 'Past profits may be established, and the value of the goodwill estimated therefrom as a basis, subject to being reduced by a showing of a depression in trade or other circumstances that would tend to make the business less valuable....' " *Id.*

■ Trial courts should make specific findings, first indicating whether goodwill exists under the particular circumstances of the case, and if so, its value. Findings should clearly state the evidence upon which the valuations are based, and preferably, the valuation method or methods on which the court relied. *See Poore v. Poore*, 75 N.C.App. 414, 331 S.E.2d 266, 272 (1985).

■ We emphasize, however, one factor that clearly should not be considered in the valuation of goodwill is the professional spouse's future earning capacity. Consistent with our position that professional degrees are not assets capable of distribution, we similarly hold that the future earning capacity of the divorcing professional should not be considered. To consider future earning capacity in the valuation of the professional corporation's goodwill would have the effect of double counting, as earning capacity is also utilized in determining an appropriate alimony award. *See, e.g., Olson v. Olson*, 704 P.2d 564, 566 (Utah 1985).

■ In this action, Mrs. Sorensen called Dr. Austin, an expert witness emi-

---

22. *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640, 647 (1987); *Carriker v. Carriker*, 151 Ariz. 296, 727 P.2d 349, 350 (Ct.App.1986). *Accord Poore v. Poore*, 75 N.C.App. 414, 331 S.E.2d 266 (1985); *In re Marriage of Goger*, 27 Or.App. 729, 557 P.2d 46 (1976); *Hurley v. Hurley*, 94 N.M. 641, 615 P.2d 256 (1980).

23. *See Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851, 858 (1986); *Hanson v. Hanson*, 738 S.W.2d 429, 434 (Mo.1987).

24. *Poore*, 331 S.E.2d at 271 (citing *Hurley v. Hurley*, 94 N.M. 641, 615 P.2d 256 (1980)); *Accord In re Marriage of Goger*, 27 Or.App. 729, 557 P.2d 46 (1976). *See also In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 179 (1984); *Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169, 1174 (1983).

nently qualified to appraise dental practices. Dr. Austin had practiced dentistry in Utah for approximately four and one-half years and worked for a firm which is in the business of appraising and selling dental practices. Dr. Austin's brokerage firm has been in business over eighteen years and sold more than 250 dental practices. Dr. Austin has personally been involved in 12 appraisals and sold 6 practices in Utah.

Based on financial information supplied by Dr. Sorensen, Dr. Austin determined that the goodwill value of the corporation was $62,560. The procedure employed by Dr. Austin is one commonly used by his brokerage firm, and is also consistent with the methodologies recognized and approved in other jurisdictions previously discussed herein.[25] The goodwill figure was derived by considering factors such as a history of the corporation's earnings, the length of time Dr. Sorensen had been in practice, the number of his patients, the location of the practice, his facilities and equipment, accounts receivable, and an evaluation of the transferability of profits to a prospective buyer.

Dr. Austin further testified that the goodwill value of dental practices in Utah ranged from 15 to 80 percent of their gross receipts. Accordingly, based on an analysis of the factors previously described, Dr. Austin calculated a 34 percent factor for goodwill and then reduced Dr. Sorensen's average gross receipts by 66 percent. The 34 percent goodwill factor was on the low end of the 15 to 80 percent which he testified had been used by his brokerage corporation to value and sell other Utah dental practices.

To refute Dr. Austin's valuation, Dr. Sorensen called Mr. Deters, his accountant, and Mr. Nuttal, a CPA. Neither witness demonstrated expertise in appraising dental practices, and their testimony was virtually nonresponsive on the issue of a profes-

sional corporation's goodwill. The trial court apparently chose to believe Dr. Austin, and we will not disturb the trial court's factual findings unless they are clearly erroneous. *See* Utah R.Civ.P. 52(a). A trial court's fundamental role in the adversary process is to judge the credibility of witnesses and he or she is free to choose among expert testimony. *See Canning v. Canning,* 744 P.2d 325, 329 (Utah Ct.App. 1987). *See also Lockwood v. Lockwood,* 205 Neb. 818, 290 N.W.2d 636, 640 (1980). "[T]his court will give weight to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of facts rather than the opposite." *Id.*

Other jurisdictions have upheld a trial court choosing the testimony of one party's expert over the other's expert in the context of valuing goodwill. *See, e.g., Kowalesky v. Kowalesky,* 148 Mich.App. 151, 384 N.W.2d 112, 115 (1986); *In re Marriage of Hull,* 712 P.2d 1317, 1321 (Mont. 1986); *Wright v. Wright,* 469 A.2d 803, 808 (Del.Fam.Ct.1983). In *Wright,* the Delaware Court indicated that one of the important considerations for its decision to accept one expert's testimony was that the husband's expert had *never* been involved in the sale or liquidation of like practices. 469 A.2d at 808 (emphasis added). Similarly, in *Kowalesky,* a case involving the valuation of a dental practice, the Michigan Court of Appeals held that the trial court's valuation, which seemed to favor the plaintiff, was not clearly erroneous. The trial court's valuation was based on the plaintiff's expert testimony, and the appellate court noted that plaintiff's expert was "*actively involved in the sale of dental practices and the valuation of those practices.*" 384 N.W.2d at 115 (emphasis added). In *Kowalesky,* the court stated: "[d]efendant's expert, a certified public accountant who has a number of dentists as clients, did

---

**25.** Although not specifically stated by either party, Dr. Austin appeared to use in part a market value methodology to value Dr. Sorensen's dental practice. A market value approach has been cited with approval in other jurisdictions, *see, e.g., In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 180 (1987); and in at least one jurisdiction, is the only acceptable methodology. *See Hanson v. Hanson,* 738 S.W.2d 429, 435 (Mo.1987). Of the five methodologies, a market value approach often produces the most conservative estimate for goodwill. 2 *Valuation and Distribution of Marital Property,* § 23.05[2][a] at 23–66 (1988).

not have similar valuation experience [as plaintiff's expert]." *Id.*

We find these cases analogous. Dr. Austin has considerable experience in the valuation and sale of dental practices. Conversely, Dr. Sorensen's experts .both candidly admitted that they were not involved in the sale and valuation of dental practices.

Our able colleague in dissent takes a novel approach to the review of expert testimony. He goes even further than rejecting the expert found more credible by the trial court and adopting another. He gives his own "expert" opinion on the valuation of Dr. Sorensen's professional corporation, ignoring the testimony of all the experts and the findings of the trial judge. We think he simply believes that as a matter of law, the goodwill of any professional association should not be valued and distributed in a divorce action. We believe the overwhelming authority is to the contrary.

Based on the foregoing, we find the trial court's valuation of the goodwill of Dr. Sorensen's practice, relying on the testimony of Dr. Austin, was not an abuse of discretion.

### Accounts Receivable

■ Dr. Sorensen claims that the trial court improperly considered accounts receivable in the valuation of his dental practice. We disagree.

Dr. Sorensen relies on *Dogu v. Dogu*, 652 P.2d 1308 (Utah 1982). In *Dogu*, the trial court excluded $25,000 of accounts receivable in its consideration of the value of the defendant's professional corporation. Finding the trial court had not abused its discretion, the Utah Supreme Court summarily stated "[t]he corporation's accounts receivable represent deferred income from which respondent may meet his ongoing

alimony and child support obligations to appellant." *Id.* at 1309.

We are not persuaded that this statement from *Dogu* stands for the proposition that accounts receivable may *never* be considered in the valuation of a professional corporation. Dr. Sorensen has not cited additional authority for this proposition, and we note other jurisdiction's commonly hold that accounts receivable may be considered in the property distribution.[26] In fact, the Michigan Court of Appeal concluded that the trial court committed reversible error by *failing* to consider accounts receivable in its valuation of a dental practice. *Kowalesky v. Kowalesky*, 148 Mich. App. 151, 384 N.W.2d 112, 115 (1986).

Based on the foregoing, we conclude the trial court properly considered accounts receivable in its valuation of Dr. Sorensen's dental practice.

### Accounts Payable

■ Dr. Sorensen claims that Dr. Austin's valuation, which was apparently adopted by the trial court, failed to consider $10,129 in accounts payable. The record is ambiguous on this point, but even if the full amount of the accounts payable was not considered, we find the error was harmless.

Both parties to this action were awarded approximately $131,000 in marital assets. Property distributions in divorce actions need not be "equal" but rather "equitable." *See generally Berger v. Berger*, 713 P.2d 695 (Utah 1985). "While equality is a worthy goal, precise mathematical equality is not essential or required." *Canning v. Canning*, 744 P.2d 325, 329 (Utah Ct.App. 1987). Accordingly, we find that even if the trial court failed to consider the full amount of accounts payable in its calculations, such a mistake was harmless error considering the total property distribution.

**26.** *See, e.g., Kopplin v. Kopplin*, 74 Or.App. 368, 703 P.2d 251, 253 (1985) (trial court did not err by discounting accounts receivable by 30 percent); *In re Marriage of Reiling*, 66 Or.App. 284, 673 P.2d 1360, 1365 (1983) (accounts receivable are property to be included in the valuation of a law firm); *In re Marriage of Bayer*, 687 P.2d

537, 538 (Colo.Ct.App.1984) (accounts receivable represent debts for services already rendered and therefore constitute marital property); *In re Marriage of Goldstein*, 120 Ariz. 23, 583 P.2d 1343, 1344 (1978) (trial court properly included accounts receivable as a marital asset).

## Conclusion

Based on Dr. Austin's testimony, the trial court found that Dr. Sorensen's practice was worth $100,000 which included tangible assets, accounts receivable, and goodwill. The trial court further found that dental practices sell for approximately 90 percent of their value, hence $90,000 was designated as the total value of the practice. The trial court then discounted this figure to account for the time the parties were married. The trial court found that Dr. Sorensen had been practicing for sixteen years, and the parties had been married for approximately eleven and one-half years. He further concluded the majority of the goodwill value of the practice had been established during the marriage.[27] Thus, he reduced or multiplied 11.5/16 or 69 percent by $90,000 to arrive at $62,100, the total value he assigned Dr. Sorensen's dental practice as a marital asset.

Having concluded, 1) the trial court properly considered accounts receivable and goodwill in its valuation of Dr. Sorensen's dental practice, and 2) that failing to consider accounts payable in its entirety was harmless error, we find the trial court's ultimate valuation of Dr. Sorensen's professional dental corporation is supported by the record, and accordingly, the trial court's valuation is affirmed.

## II.  ATTORNEY FEES

■ In order to recover attorney fees in a divorce action, the moving party must set forth evidence, 1) demonstrating that the award is reasonable, and 2) establishing the financial need of the requesting party compels the award.[28] The relevant factors for determining the reasonableness of the request include, the necessity for the number of hours dedicated, the reasonableness of the rate charged in light of the difficulty of the case and the result accomplished, and the rates commonly charged for similar services in the community.[29]

In the instant case, there is sufficient evidence to demonstrate Mrs. Sorensen's financial need. However, counsel for Mrs. Sorensen concedes that no evidence was offered regarding the "reasonableness" of the attorney fees incurred to maintain this action. Instead, Mrs. Sorensen's attorney proffered an exhibit reflecting only the time spent and the rates charged. Dr. Sorensen's counsel stipulated that the proffer could be received, but *expressly* refused to stipulate to the "reasonableness" of the fees. No evidence was presented relating to the reasonableness of the number of hours, the usual hourly rate for divorce cases in the community, nor the overall reasonableness of the fee. *See Talley,* 739 P.2d at 84. Additionally, the court's written findings of fact and conclusions of law, as well as the decree of divorce, make no reference to the reasonableness of the fees. Accordingly, we find the proffered testimony insufficient to sustain the award of attorney fees, and therefore, we reverse.

## III.  EXPERT WITNESS FEES

■ Ordinarily, a trial court cannot require one party to pay the other party's expert witness fees in excess of the statutory rate.[30] *Kerr v. Kerr,* 610 P.2d 1380, 1384 (Utah 1980). *See also Frampton v. Wilson,* 605 P.2d 771, 773 (Utah 1980). However, in this case the parties agreed by pretrial stipulation to have their real prop-

---

27. Although the record does not conclusively establish that the goodwill value of Dr. Sorensen's practice increased at a constant rate throughout the marriage, there is also no controverting evidence establishing that it did not. In fact, Dr. Sorensen presented very little credible testimony regarding the goodwill value of his corporation. Based on the evidence before the trial court, its method of apportionment was not an abuse of discretion.

28. *Kerr v. Kerr,* 610 P.2d 1380, 1384–85 (Utah 1980); *Talley v. Talley,* 739 P.2d 83, 84 (Utah Ct.App.1987).

29. *Kerr,* 610 P.2d at 1384–85; *Talley,* 739 P.2d at 84.

30. Utah Code Ann. § 21–5–4(1) (1988), provides that "[e]very witness legally required or in good faith requested to attend ... [trial], is entitled to $14 per day for each day in attendance and 30 cents for each mile actually and necessarily traveled in going only."

erty appraised by Mr. Heiskanan. They further agreed that his fee would be paid initially by Dr. Sorensen, with the ultimate responsibility for payment to be determined by the trial court. Stipulations are conclusive and binding on the parties unless good cause is demonstrated warranting relief therefrom. *Higley v. McDonald*, 685 P.2d 496, 499 (Utah 1984). Dr. Sorensen has not set forth adequate justification to discharge his obligations under the pretrial stipulation. Simply because Dr. Sorensen did not agree with the appraiser's valuation of the parties' real property, and instead chose to hire additional experts, does not constitute the requisite good cause. We find no abuse of discretion and affirm the trial court's allocation of the appraiser's fee.

In sum, we affirm the trial court's valuation and distribution of the parties' property, and its allocation of expert witness fees. We reverse the award of attorney fees.

GARFF, J., concurs.

JACKSON, Judge (concurring in part and dissenting in part):

I dissent from Part I of the majority opinion.

Why are my colleagues and others in the legal system trying to create "new property" in the context of marriage dissolution? Because of real and perceived injustices and inequities in property settlements in divorce decrees. As a result of their high income production, professionals are prime targets for the new, expansive definitions of property that include: (1) advanced university degrees; (2) licenses to practice; (3) equitable restitution; and (4) professional goodwill. Proponents of "new property" justify new definitions because they believe those definitions provide the divorce system with additional means to be fair.

## STATUS OF THE "NEW PROPERTY" IN UTAH

In *Petersen v. Petersen*, 737 P.2d 237, 241 (Utah Ct.App.1987), this court held that "an advanced degree is or confers an intangible right which, because of its character,

cannot properly be characterized as property subject to division between the spouses." We also stated it is proper to consider advanced degrees or professional licenses when determining a spouse's ability to provide support, because an advanced degree is ordinarily an indicator of potential future earnings.

> But it is the discrepancy in their earning power which is the basis for alimony, not the discrepancy in their educations.... Whether a spouse's ability to provide support is the result of an advanced degree or professional license is irrelevant to the analysis. The key is the spouse's *ability*.

*Id.* at 243 (emphasis in original).

In *Rayburn v. Rayburn*, 738 P.2d 238, 240–41 (Utah Ct.App.1987), we reaffirmed our holding in *Petersen*, but acknowledged there will be situations involving advanced degrees and professional licenses where an award of non-terminable rehabilitative or reimbursement alimony would be appropriate. *See Petersen*, 737 P.2d at 242 n. 4. In my view, reimbursement alimony is a return on investment in one spouse made by the financially supporting spouse. In contrast, rehabilitative alimony relates to lost investment in one's self, resulting in lost or lower future income stream.

The need for reimbursement is most pronounced in "threshold" divorces, where the parties split up before the benefits of one spouse's enhanced earning potential are realized. Like *Rayburn*, the instant case does not involve a threshold divorce. Dr. Rayburn acquired his medical degree before the parties married. Mrs. Rayburn did not endure substantial financial sacrifices or defer her own education to assist his education. She shared the financial rewards of the degree for several years. His income production brought considerable real and personal property into the marriage that was equitably divided.

Similarly, Dr. Sorensen acquired his degree, license, and dental clientele and equipment *six years* before marriage. Mrs. Sorensen contributed nothing to assist him in those acquisitions; she made no sacrifice, financial or otherwise. She

shared his financial rewards for eleven years and received considerable tangible property in the divorce decree, plus alimony and child support. If the facts had warranted it, she could have been awarded non-terminable rehabilitative or reimbursement alimony.

In another recent divorce case involving a professional spouse, *Martinez v. Martinez*, 754 P.2d 69 (Utah Ct.App.1988), the majority followed *Petersen* and *Rayburn* insofar as it held that a medical degree is not property subject to valuation and distribution in a divorce. However, stating that Mrs. Martinez's situation required "more creative" analysis than the usual case, *Martinez*, 754 P.2d at 76, the majority then moved beyond rehabilitative or reimbursement alimony to create new property by requiring an award of "equitable restitution" in addition to traditional alimony and property division.[1] *See id.* at 78. In a footnote, the majority emphasized that equitable restitution would not be awarded where the marriage lasted for many years after receipt of the professional degree; in such a case, sufficient assets would be accumulated and an appropriate distribution to the requesting spouse would provide a share of the economic benefits earned as a result of the degree. *Id.* at 78 n. 10.

Equitable restitution, this new animal not to be confused with traditional alimony or property, was described by the *Martinez* majority as "nothing more than an equitable sharing of the rewards of both parties' common efforts and expectations." *Id.* at 78. As I stated in my dissent, the effect of that decision is to unnecessarily create a distinctly new and unprecedented form of marital property. *Id.* at 82 (Jackson, J., dissenting).

The instant case is the fourth attempt in Utah to create "new property" in the professional arena. My colleagues have cooperated by uncritically embracing a new definition equating "goodwill" with "reputation," discussed below. I agree that we must strive for equity and fairness in divorce actions, but I do not agree with the means they have chosen. Under our statute, Utah Code Ann. § 30-3-5 (1988), equity can be achieved through non-terminable alimony awards consistent with *Rayburn* and *Petersen*. This method is preferable to the judicial selection of new definitions of property.

## ORIGINS OF PROFESSIONAL GOODWILL

Like many legal doctrines, that of professional goodwill as a marital asset divisible at divorce had one of its earliest airings in the California appellate courts. In *Mueller v. Mueller*, 144 Cal.App.2d 245, 301 P.2d 90, 94-95 (1956), the Third District Court of Appeal quoted what it believed to be the "general rule" in 28 Am.Jur. 808 that goodwill could exist in a professional practice or business dependent on the personal skill and ability of a particular person, but did not adopt that rule. The authority relied on in *Mueller*, however, focused on an actual sale of a professional practice. In any case, the *Mueller* court disposed of the case by assuming *no* goodwill could attach to such a business and then holding that the dental laboratory business at issue did not depend solely on the divorcing husband's personal skill. Six years later, the same court said—again in dicta—that the value of a professional practice was property to be considered at marriage dissolution; the appellant ex-wife had not even appealed the trial court's failure to award her any of the value of the respondent's law practice. *Brawman v. Brawman*, 199 Cal.App.2d 876, 19 Cal.Rptr. 106, 109 (1962). Finally, relying on *Mueller* and *Brawman*, the Second District Court of Appeal explicitly embraced the doctrine in *Golden v. Golden*, 270 Cal.App.2d 401, 75 Cal.Rptr. 735 (1969), and stated the following rule:

> [I]n a divorce case, the good will of the husband's professional practice as a sole practitioner should be taken into consideration in determining the award to the wife.... [I]n a matrimonial matter, the practice of a sole practitioner husband will continue, with the same intangible

1. The Utah Supreme Court has granted Dr. Martinez's petition for a writ of certiorari to consider the issue of equitable restitution. *Martinez v. Martinez,* 765 P.2d 1277 (Utah 1988).

value as it had during the marriage. Under the principles of community property law, the wife, by virtue of her position of wife, made to that value the same contribution as does a wife to any of the husband's earnings and accumulations during marriage.

*Id.* at 405, 75 Cal.Rptr. at 737–38. The California cases involving professional goodwill after *Golden* did not even argue about whether goodwill can exist in a professional practice. Instead, they assumed both that such goodwill could and did in fact exist, and focused on how to put a price tag on it. *E.g., In re Marriage of Fortier,* 34 Cal.App.3d 384, 109 Cal.Rptr. 915 (1973); *In re Marriage of Lopez,* 38 Cal.App.3d 93, 113 Cal.Rptr. 58 (1974); *In re Marriage of Foster,* 42 Cal.App.3d 577, 117 Cal.Rptr. 49 (1974). As discussed more fully below, this shift in focus has two unfortunate results: (1) the use of a broad, new definition of "goodwill," only in the professional practice context, that equates it with personal reputation; and (2) the assumption that goodwill exists in every professional practice, relieving the requesting party of the burden of proving that it exists.

Tracking the elevation of professional goodwill from dicta to law in California, one writer has summarized:

Thus in just 17 years ... California carried a passing quotation from a law encyclopedia that goodwill now could be sold as part of a professional practice, to a clear acceptance, in *Fortier,* that professional goodwill was an asset accountable as property upon a hypothetical sale at marriage dissolution.

Lurvey, *Professional Goodwill on Marriage Dissolution: Is it Property or Another Name for Alimony?,* 52 Cal.State Bar J. 27, 82 (1977). The result, Lurvey claims, is a "confusion of rules and methods for valuation, compounded by inconsistencies in logic and application and conceptual problems over possible duplication of

spousal support and denial of equal protection." *Id.* at 85.

## EXISTENCE OF PROFESSIONAL GOODWILL

Judges, like valuation formulas, are leapfrogging over the threshold question of whether goodwill exists at all in a particular professional business, moving directly to the issue of what the value of that goodwill is. The court in *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175 (1984), takes a stab at existence first, valuation second, but ultimately caves in and comingles the two issues:

Two areas surrounding the [factors relevant to valuation of goodwill, set out in *In re Marriage of Lopez,* 38 Cal.App.3d 93, 113 Cal.Rptr. 58 (1974) and adopted in *In re Marriage of Fleege,* 91 Wash.2d 324, 588 P.2d 1136 (1979),] must be clarified: (1) the first step in evaluation [of goodwill] under the *Fleege* factors is the determination of the existence of goodwill and (2) several accounting or appraisal methods may be used by the trial court in conjunction with the *Fleege* factors.

The *Lopez* court warned that evaluation of goodwill must be done with considerable care and caution. In carrying out this warning the court instructed that the trial courts should first determine if goodwill exists in a particular practice. Not every professional business as a going concern necessarily has goodwill. The Washington goodwill cases to date have not recognized this preliminary inquiry and we do so today.

*Hall,* 692 P.2d at 179 (citations omitted). Unfortunately, the *Hall* court then states, "This preliminary inquiry takes place during the general evaluation process. The trial court must bear in mind that there may be zero goodwill." *Id.* Thus, even after *Hall,* the *existence* of goodwill is going to be determined by a calculation or formula determining whether it has a *value;* if it has a value, then it exists.[2] "One

2. This approach, which begs the preliminary question of existence, is similar to that adopted by the Arizona court in *Mitchell v. Mitchell,* 152 Ariz. 317, 732 P.2d 208, 214 (1987), despite recognition of the need for a two-step determination:

As a general rule, "the court should clearly state whether it finds the practice to have any

or more [approved valuation] methods may be used in conjunction with the *Fleege* factors to achieve a just and fair evaluation of the existence and value of any professional's goodwill." *Id.* 692 P.2d at 180. The *Fleege* factors referred to in *Hall*, 692 P.2d at 179, which are also the factors set forth in *Lopez*, are the professional's age, health, past demonstrated earning power, professional reputation in the community as to his judgments, skill, and knowledge[3] and his comparative professional success. But these are the factors outlined in *Fleege* and *Lopez* as relevant to the *valuation* of professional goodwill, not its *existence*. See *Fleege*, 588 P.2d at 1138; *Lopez*, 38 Cal.App.3d at 109, 113 Cal.Rptr. at 68. Thus, after this bit of sleight of hand in *Hall*, Washington uses the same factors to determine both that professional goodwill exists and that it has some value. Then the amount of that value is determined with the aid of an expert who is to use one of the five approved formulas. Accordingly, goodwill *exists* when a professional has health, a financial track record, and reputa-

tion. Thus, every professional who does not work as a salaried employee[4] automatically has goodwill because every professional has all or most of these factors.

My colleagues in this case adopt the California and Washington approach and make the same unfortunate mistake. Their position, boiled down, is that a non-salaried professional person's reputation is "goodwill" and, therefore, property. Failing to discern the necessity of a preliminary factual finding, based on supportive evidence in the record, that such professional goodwill exists, the majority opinion jumps right into valuation of Dr. Sorensen's dental practice.

In California, the professional goodwill doctrine found its roots in dicta. Here, my colleagues think they have found identical roots in dicta in *Gardner v. Gardner*, 748 P.2d 1076 (Utah 1988). In *Gardner*, however, Justice Stewart was concerned that the parties' experts had failed to address the goodwill of an established business or-

---

goodwill, and if so, its value, and how it arrived at that value." *Poore v. Poore*, 75 N.C.App. 414, 331 S.E.2d 266 (1985). However, because the trial court stated that it utilized the gross fee approach advocated by appellee's own expert, and the valuation was reasonably supported in the record by expert testimony, we find no error.

**3.** *Fleege* states that the value of professional goodwill can be determined based partially on the professional's "reputation in the community for judgment, skill, and knowledge." *Fleege*, 588 P.2d at 1138. But the case it cites as authority for the elements engendering goodwill, *In re Estate of Glant*, 57 Wash.2d 309, 356 P.2d 707, 709 (1960), involved Pacific Iron and Metal Company, a business partnership, and referred only to "reputation for honesty and fair dealing."

**4.** Significantly, the primary reason Dr. Sorensen would have the "new goodwill" is because he elected to work for himself as a non-salaried professional rather than work for someone else for a salary. For example, assume a lawyer in solo practice who has five winnable wrongful death cases on hand. When he wins or settles those cases, the "new goodwillers" attribute goodwill to him because he will have excess earnings above what the average salaried lawyer makes. However, if he were to take his cases to another lawyer or firm, turn them over, and agree to work on them for a high salary until

successfully completed, he would not have any "new goodwill" as property to be divided upon divorce, although his high income is virtually the same.

The court in *Hall* reached this absurd result, professing to see a distinction with a difference between salaried and non-salaried professionals. Dr. Judith Hall, a forty-year-old professor at the University of Washington, had received a salary increase from $32,750 to $42,000 around the time of the divorce. She was "widely published and enjoy[ed] a reputation as one of the 10 top physicians in the nation in the field of pediatric genetics.... Numerous medical schools across the nation ha[d] offered her employment with salaries up to $60,000." *Hall*, 692 P.2d at 176. The Washington Supreme Court held, as a matter of law, that a salaried employee such as Judith Hall *cannot* have goodwill. *Id.* at 178. *But see* L. Weitzman, *The Divorce Revolution* 122 (1985) (suggesting the California courts and others have already laid the necessary foundation for finding "goodwill" in salaried employees too). The *Hall* court apparently reached this conclusion because "only the practicing professional has a business or practice to which the goodwill can attach." *Hall*, 692 P.2d at 178. Was not Judith Hall a practicing professional? Did she not, like her physician husband who worked for a professional corporation, also have health, reputation for skill and knowledge, and comparative professional success?

ganization, the Ogden Clinic, not the personal reputation of Mr. Gardner:

> The Ogden Clinic, of which Mr. Gardner is a member, is a well-entrenched institution, whose twenty-three members have banded together in a business organization. It is not likely to be highly susceptible to earnings interruptions because of the ill health of one of its members. The Ogden Clinic is not entirely valueless.... Mrs. Gardner's accountants value the business much higher [than Mr. Gardner does]. Neither gave consideration to the good will inherent in the professional clinic.

*Id.* at 1080 (footnote omitted). The footnote to this text also clearly refers to goodwill as an asset of a business, not of a person. "The ability of a business to generate income from its continued patronage is commonly referred to as good will." *Id.* at 1080 n. 1.

The twenty-three member Ogden Clinic is the perfect contrast to Dr. Sorensen's one-man dental practice, which *is* highly susceptible to earnings interruptions from many causes. Moreover, when well, he can work only so many hours a day and that is the end of his production. His opportunities to increase earnings are negligible.

As the court in *Gardner* seems to recognize, traditional nonlegal definitions of goodwill focus on it as the asset of a business, not of an individual. The goodwill concept used by accountants focuses on its measurement through a deductive process, not on its nature. Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings*, 18 Fam.L.Q. 213 (1984). Thus, their criteria for goodwill are aimed at something that can be measured, such as excess earning power or payments made in excess of an established value of a resource. *Id.* To economists, the value of an

asset depends on the future profits it can produce. Thus, the economic concept of goodwill focuses on the fact that an established business can make greater profits than new businesses because of its internal and external relationships; once the revenue produced by these relationships is capitalized, it can be viewed as an asset of the business, i.e., goodwill. *Id.* at 214.

In contrast, the legal concept of goodwill focuses on the idea that it is an asset which generates excess earnings. Because the legal concept has not been fitted into the existing accounting and economic framework, however, experts have had a difficult time applying the concept. In particular, the legal concept does not clearly differentiate between excess returns to individuals and excess returns to businesses. This confusion is especially noticeable in the case of professional practices.

In both the accounting and economic literature, goodwill is an asset of a business based on earnings in excess of normal profits. It is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers, and suppliers. The same analysis would not view goodwill as being reflected in an individual. If excess profits of a business are attributable to an individual, that individual should be able to capture that value in higher wages. It would be appropriate to view personal attributes as "reputation" rather than as "goodwill." By using reputation and goodwill interchangeably, the courts have created a confused situation in the evaluation of professional businesses.

*Id.* at 215.[5]

In a professional practice, goodwill can exist in the business, but not in the individ-

---

**5.** Professor Allen Parkman, an economist and lawyer who teaches at the University of New Mexico's Anderson School of Management, attributes the confusion in the case law to the lack of any focus on a clear definition of goodwill, which the majority opinion in this case shares.

The courts can obviously define terms in a manner that differs from their meaning in accounting and economics. However, if they then turn to these fields for an evaluation, they have to realize the confusion that is going to be created. If the courts say that there is goodwill in a sole practice, when there is none from an accounting or economic perspective, a problem of evaluation is created. It is like saying that an apple is an orange and then, even in the face of protests from an

ual practicing the profession. A large professional business organization can have substantial goodwill. The Ogden Clinic fits the example of such an organization given by Parkman. *See id.* at 216. It does not have any one professional's name directly associated with it; patients come not because of any particular individual professional, but because of their own needs and the clinic's past delivery of high quality service. If that clinic sold for a price greater than the value of its tangible assets, the value of that excess, goodwill, would not be based on the presence at the clinic of any particular employee or professional.

Dr. Sorensen's solo dental practice fits Parkman's example, at the other extreme, of the limited opportunities for goodwill in a small professional practice, even one that is smoothly operated. *See id.* His patients come because of high quality service. He has a few employees, but equally qualified people are readily available. Patients would not necessarily return to his office location just because they had gone to a doctor there before. A new doctor would not pay for his practice much in excess of the value of his tangible assets and accounts receivable.

By distorting the original definition of business goodwill to equate it with such subjective factors as personal reputation in the professional practice context, the majority's decision, like the cases it relies on, fabricates the existence of goodwill as as asset belonging to every non-salaried professional, whether in a solo practice, partnership, or professional corporation. I believe an objective threshold standard for determining the *existence* of goodwill must be enunciated.

## ANALYSIS OF VALUATION METHODS AND FORMULAS APPLIED TO "NEW" GOODWILL

The majority asserts that the valuation procedure employed by Dr. Austin, Mrs. Sorensen's expert, is one commonly used by his brokerage firm and is also consistent with methodologies recognized and approved in other jurisdictions. But they are not sure about the method he employed: "Although not specifically stated by either party, Dr. Austin appeared to use in part a market value methodology to value Dr. Sorensen's dental practice. A market value approach has been cited with approval in other jurisdictions, *see, e.g., In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 180 (1984). . . ." Footnote 25, *supra.* Actually, Dr. Austin used his own gross revenue capitalization formula and merely labeled his method a "market value" approach. Gross revenue formulas automatically attribute goodwill to every professional because every professional has revenue.

In *Hall*, the Washington Supreme Court approved five professional goodwill valuation methods, including three capitalization formulas based on capitalization of net profits, not of gross revenue. In this case, Austin did not use the market value method, described by the court in *Hall* as follows:

> The fourth method, the market value approach, sets a value on professional goodwill by establishing what fair price would be obtained in the current open market if the practice were to be sold. This method necessitates that a *professional practice has been recently sold, is in the process of being sold or is the subject of a recent offer to purchase.*

*Hall*, 692 P.2d at 180 (emphasis added).[6]

Thus, although *Hall* approves only a market value approach based on a current

---

agricultural expert, asking for an analysis of the apple's citrus content.
Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings*, 18 Fam.L.Q. 213, 216 (1984).

**6.** Even this "past sales" method of valuing professional goodwill has been criticized as subject to manipulation and not necessarily accurate, *see e.g.*, 2 *Valuation and Distribution of Marital*

*Property* § 23.05[2](a) at 23–66 (J. McCahey ed. 1988), prompting some courts to insist on the use of accounting formulas that capitalize excess earnings. These, however, have their own faults, including the problem of estimating a consistent "normal" return on tangible assets by which to measure "excess" earnings and the broad leeway given to the appraiser to choose a capitalization rate. *Id.* § 29.05[3][c] at 29–44, 45.

sale of the particular practice at issue, Austin used a past sales approach that only involved six sales of *other* practices, sales generated by his appraisal firm at prices created by its methods. The number of sales (two each year for three years) is too few to establish any market and none were in the vicinity of Roy, Utah or Weber County, Utah. They are too remote in both time and place to be reliable indicators of the value of any goodwill in Dr. Sorensen's practice.

Unlike the majority, I believe courts should not be hoodwinked into accepting the valuation testimony offered by one party or the other, just because one sounds more credible than the other. If both experts are out in left field, the court should ignore them or require counsel to provide the proper data and analysis.

## FAILURE TO DETERMINE WHETHER THE PROFESSIONAL'S CAREER ASSET WAS ACQUIRED BEFORE MARRIAGE

Even if there was evidence in this case on which to base a finding that goodwill exists in Dr. Sorensen's dental practice, and even if there was credible evidence to support the value of that goodwill, there is

one remaining flaw in the property distribution in this case. The trial court never examined—and none of the evidence addresses—whether the intangible asset of professional goodwill was acquired before or after the marriage vows.

Here, the trial court did recognize a timing problem with the expert's valuation methods. Mrs. Sorensen's expert did not pay attention to the time when Dr. Sorensen acquired his reputation or "goodwill." The court found that "[t]he only reasonable way to value said practice is to proportion it based upon the years the parties have been married during practice." [7] There is *no* evidence to support that finding. To the contrary, there is evidence that virtually all, if not all, of the value of the practice, including goodwill or reputation, was Dr. Sorensen's pre-marital asset. Dr. Sorensen's evidence showed that, when adjusted for inflation, net earnings from his professional services were essentially the same at the time of marriage as at the time of divorce. The number of his clients had decreased. Thus, there was no increase in the value of his goodwill or reputation during the marriage. Whatever it was and whatever its value, it was Dr. Sorensen's

It is important to note that there is a great deal of diverse opinion as to whether earnings from a professional practice should be capitalized at all and if so, what rate is applicable. Critics of the use of capitalization point out that a generally accepted accounting and appraisal principle is that earnings are to be capitalized only where it can be assumed they will continue in the future. In the context of a professional practice, therefore, a court employing the formula approach is, either directly or implicitly, placing a value on future earnings and results. Yet, courts are, often without adequate explanation, quick to point out that they are not so doing.

*Id.* § 29.05[3][c] at 29–46 (footnote omitted). Often, the professional ends up paying for the new goodwill with future earnings.

[Another] difficulty with these accounting formulas [for valuing professional goodwill] is that the result may be inappropriately high since factors other than goodwill may contribute to the excess income. For instance, if a physician works 60 to 70 hours a week instead of the usual 40 to 50, the excess earnings generated by this additional effort may be attributed to goodwill.

Comment, *Identifying, Valuing, and Dividing Professional Goodwill as Community Property at Dissolution of the Marital Community,* 56 Tul.L. Rev. 313, 333–34 (1981) (footnote omitted).

7. A question not yet brought before the courts is the issue of the existence of pre-marital goodwill when the practitioner spouse has married well after the commencement of his practice. This could become quite significant. For example, a professional who had been in practice for twenty or more years could marry and then dissolve the marriage a short time later. Presumably the value of the goodwill accrued as of the date of the marriage would be separate property and would form a sort of basis. Only the goodwill accrued during the marriage would be community property. Its value could be determined by calculating the difference between the value of goodwill as of the date of dissolution and the value as of the date of marriage. *Since goodwill is not accrued at a constant rate, as are pension benefits, the application of a simple time-based percentage formula to the value on the date of dissolution would not suffice.* Comment, *supra* note 6, at 340 (footnote omitted) (emphasis added).

pre-marital asset, not a marital asset.[8]

Since Dr. Sorensen owned his career asset, his practice, and its "goodwill" prior to marriage, that asset should be treated as his separate property, to be awarded to him at dissolution in the absence of exigent circumstances faced by the trial court in fashioning equitable awards of property, support, and alimony, circumstances not present here. *See Preston v. Preston*, 646 P.2d 705, 706 (Utah 1982); *see also Mortensen v. Mortensen*, 760 P.2d 304, 310 (Utah 1988) (Zimmerman, J., concurring).

## CONCLUSION

In summary, I dissent from my colleagues' creation of yet another species of new property through their broad redefinition of goodwill in the professional practice context, and from their erroneous approval of valuation factors and an unacceptable valuation method as a substitute for evidence of the existence of goodwill, however defined. Traditional alimony awards, plus nonmodifiable rehabilitative or reimbursement alimony awards, where appropriate, offer the best methods for achieving equity and fairness in Utah.

Even if I agreed with the majority's analysis and disposition of the professional goodwill issue, I would nonetheless vacate the trial court's award of part of the value

to Mrs. Sorensen because there is no evidence to justify not returning it to Dr. Sorensen as his pre-marital asset.

---

8. Another method of analysis, recently set forth by Professor Parkman in a thought-provoking law review article, better demonstrates that Dr. Sorensen's income-producing ability was his, not theirs. *See* Parkman, *The Recognition of Human Capital as Property in Divorce Settlements*, 40 Ark.L.Rev. 439, 440–49 (1987). Dr. Sorensen (or someone other than Mrs. Sorensen) made all the essential investments in the skill and knowledge he has that permits him to generate income in excess of the income he could derive from his innate strength and intelligence. His investments in himself, which increased the expected future income stream that would flow to him, were completed at least six years prior to his marriage. Usually,

the greatest impediment to attaining access to a professional education is probably not the direct costs of the education, but the difficulty of obtaining admission. The ability to gain admission is the result of earlier human capital investments. After admission, the most substantial cost of graduate education is usually the income sacrificed by the student.

*Id.* at 444–45. The current value of this income stream, his human capital, is a personal asset. *See id.* at 440, 447. That asset has value precisely because it will produce a stream of future returns. *Id.* at 439–40 & n. 4. Even in a closer case, where a professional married while still a medical student, Parkman advocates treatment of an investment in one's self as non-marital property:

For a medical doctor, the major increase in his future anticipated income stream occurs when he enters medical school, because the probability is very high that he will finish. ...[T]he critical investments had already occurred when the student entered medical school....

Under normal circumstances, the investment in human capital prior to marriage will be so large and essential relative to the investment after marriage that an individual's human capital should be treated as separate property.

*Id.* at 448.